**Robert J. McCARTHY**

v.

**John R. MANSON, Commissioner of Corrections of the State of Connecticut.**

**Civ. No. H 80–263.**

United States District Court,
D. Connecticut.

Jan. 15, 1982.

On Motion to Alter or Amend
Judgment Dec. 3, 1982.

Michael R. Sheldon, Robert Holzberg, University of Connecticut Crim. Clinic, West Hartford, Conn., John T. Scully, Cooney, Scully & Dowling, Hartford, Conn., for petitioner.

John M. Massameno, Carl Schuman, Asst. State's Attys., Office of the Chief State's Atty., Div. of Crim. Justice of the Judicial Dept. of the State of Conn., Wallingford, Conn., for respondent.

RULING ON MOTION TO ALTER OR
AMEND JUDGMENT

JOSE A. CABRANES, District Judge:

By a motion to alter or amend a judgment entered with the consent of both parties (styled "Motion to Open and Amend Judgment"), the Office of the Chief State's Attorney, a part of the judicial department of the state government, seeks the reincarceration of a man released from prison by this court; the state had urged his release, pursuant to a writ of habeas corpus issued by the court, after it conceded that it had violated his constitutional right to a speedy trial.

Robert J. McCarthy was convicted of murder at a trial held in the Superior Court of the State of Connecticut in January 1977, fully 21 months after he was arrested and charged with the offense. After having pursued state appellate remedies, and having served five years of a twenty-five years-to-life sentence, he petitioned this court for a writ of habeas corpus, alleging that he had been denied the right to a speedy trial guaranteed by the Sixth Amendment to the United States Constitution.[1] The case was referred to United

---

1. The Sixth Amendment to the United States Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and

States Magistrate F. Owen Eagan pursuant to 28 U.S.C. § 636(b) and Rule 10, Rules Governing Section 2254 Cases in the United States District Courts. The issuance of a writ was recommended by Magistrate Eagan after a three-day evidentiary hearing. Counsel for the respondent state authorities concurred in the magistrate's recommendation that a judgment enter for the petitioner and that he be released from prison. After McCarthy's release, the Chief State's Attorney discussed the matter with the Chief Court Administrator of the State of Connecticut, and thereafter, upon reconsidering the state's position, the Chief State's Attorney moved to undo the results of the earlier representations to this court by his agents and subordinates.

██ The court declines to alter or amend its prior judgment, but intimates no view as to the speedy trial rights of other habeas corpus petitioners. Robert J. McCarthy is today a free man because (1) the state of Connecticut denied his constitutional right to a speedy trial; (2) the state's attorneys conceded that McCarthy's rights had been violated; (3) the state's attorneys consented to the issuance of a writ of habeas corpus and the release of McCarthy from prison; and (4) even were any of those conclusions not beyond doubt, the state's attorneys failed to raise objections in a timely and proper way to the magistrate's recommended decision on this matter. The result is limited to the particular circumstances of this case, in which both parties urged the court to grant habeas relief, and in which subsequent application to have the court alter its prior judgment was not made properly under the law.

██ The harsh fact is that the effect of the state's conduct[2] is the release from

---

district wherein the crime shall have been committed. . . ."

2. It has been suggested by the Office of the Chief State's Attorney that release of McCarthy was an error for which this court bears blame. The suggestion is based on certain information presented to the court under seal on August 24, 1982, regarding McCarthy's background and certain conduct of McCarthy that was not the subject of the prosecution at issue here. "Based upon the information contained within [the] documents [filed under seal] and the facts proved by the State in the case of *State v. McCarthy,* 179 Conn. (1979) [sic]," Assistant State's Attorney John M. Massameno "concluded in [his] representative capacity as an attorney for the State of Connecticut that Robert J. McCarthy's liberty poses a substantial threat to the safety, security and welfare of the people of the State of Connecticut." Affidavit of John M. Massameno (sworn to on Aug. 23, 1982 and filed Aug. 24, 1982 with Motion for an Order Directing the Clerk to Accept and File Specified Documents under Seal) at ¶ 5. Thereafter, in a remarkable concluding peroration in the Respondent's Reply Memorandum (filed Sept. 27, 1982), Mr. Massameno hectors the court as follows:

The respondent respectfully suggests that the court would be ill-advised to accept the petitioner's recommendation not to reflect upon the claim that McCarthy's liberty poses a substantial threat to the community. Indeed, it is difficult to imagine a question that *should command greater reflection.* The respondent's motion seeks to stay a judgment of this court discharging from state custody a

man who killed his wife when he discovered her in the company of two black men, ordered the execution of two people because he believed that one of them had smashed the windshield of his van, and threatened to kill his Connecticut probation officer, who described McCarthy as having "the capacity for extreme violence." *See* Presentence Report, King's County Department of Probation at 2–3; *State v. McCarthy,* 179 Conn. 1, 3, 425 A.2d 924 (1979); Letter from Austin E. Adams to Terry S. Capshaw at 2. These facts hardly suggest that McCarthy's dangerousness to the community is "speculative." Nor do they recommend anything less than careful consideration of the respondent's motion. *Whatever decision this court renders on the respondent's motion for stay, it must, of course, bear full responsibility for the accuracy of any projection it makes concerning the petitioner's dangerousness to the people of the State of Connecticut.*

(emphasis supplied).

This harangue seems to be an attempt to shift blame to the court for the derelictions of the state's criminal justice system and, arguably, of the state's attorneys. Whether relevant or not to this case, the matters involving McCarthy other than those which were the subject of the 1976 and 1977 trials, were not part of the record before the court until August 24, 1982, when Mr. Massameno filed under seal certain material about McCarthy. If these materials are indeed as relevant as Mr. Massameno suggests, it is noteworthy that the state did not bother to place them before the court until *ten months* after the magistrate's recommended

imprisonment of a man convicted by a jury of a serious crime. Those who worry about the standards that govern our system of justice will be troubled by this consequence.

Yet, however harsh that outcome, the resolution of this case does not present a triumph of form over substance. On the contrary, this court's decision today is compelled by the necessity that principles of law, whether embodied in the Constitution and laws of the United States, the Federal Rules of Civil Procedure or the local rules of this district court, must remain fixed and secure. The strictures governing court and prosecutor alike are designed to insure that the processes of criminal justice are carried out with care and deliberation, for were the law applied casually and without thought, the result would not be justice, and the enforcers of the law would become merely the custodians of power.

Thus, though the holding of this case is limited to its facts, the principles controlling that holding are of more than local significance. The requirement that objections to the recommendations of a United States magistrate be timely filed, the integrity of a judgment of this court entered upon the avowed consent of both parties, and the reliability of the state's representations: those are the standards at issue in this case. To maintain such principles is not to undermine our legal system but to assure that it is founded upon the most solid bedrock.

decision was issued and *seven months* after the judgment in favor of McCarthy was entered with the state's explicit consent.

The short answer to Mr. Massameno's argument of September 27, 1982 is this: It is the duty of the courts to enforce, as best they can, the obligations imposed on litigants by our Constitution, laws and rules of procedure; responsibility for the consequences of a failure by a litigant such as the state to meet its constitutional and legal obligations rests, of necessity, on the defaulting litigant.

If the outcome of this case inspires one with concern for the safety of the people of Connecticut, it must also inspire one with alarm at the conduct of the state's attorneys during the course of this litigation, conduct which has brought about precisely the result that Mr.

Accordingly, the motion to alter or amend the judgment fails for various reasons, any one of which, standing alone, would be sufficient to determine the outcome. The motion is denied.

### Facts

On April 5, 1975, the Norwalk, Connecticut police arrested Robert J. McCarthy, the petitioner, in connection with the shooting of two persons. McCarthy was then charged under state law with the crimes of murder and attempted murder. McCarthy pleaded not guilty to both charges, and elected to be tried by a jury. The trial, originally scheduled for July 10, 1975, was delayed at the request of the state until November 3, 1976—that is, until nearly nineteen months after McCarthy's arrest. *See* Findings of Fact and Recommended Decision (filed Oct. 29, 1981), 554 F.Supp. 1275, 1293–1309 ("Recommended Decision") at 1293–1298.[3]

McCarthy was incarcerated throughout the time he was awaiting trial and sought a trial on numerous occasions during the lengthy period of time between arrest and trial. His first formal request to the Superior Court for a trial (styled "Motion for a Speedy Trial"), Recommended Decision at 1294, was made on August 28, 1975, about six weeks after the original postponement of his trial. This request was opposed by the state's attorney's office and denied by the Superior Court on September 16, 1975. Thereafter, McCarthy filed no fewer than three additional motions[4] to have his case

Massameno so strenuously deplores. *See* notes 5, 9 and 13, *infra*.

**3.** No objection was filed to the Recommended Decision. *See* Certified Official Transcript of Hearing Held on January 13, 1982 (filed Jan. 21, 1982) ("Tr. Jan. 13, 1982") and the court's endorsement order of January 15, 1982; *see* notes 5, 6, 9 and 13, *infra*.

**4.** On December 19, 1975, McCarthy filed a motion to dismiss in the Superior Court of the State of Connecticut on the ground that the state had failed to afford him a speedy trial, in violation of the Sixth Amendment to the United States Constitution; on June 16, 1976 and on September 15, 1976, McCarthy filed his second and third motions to dismiss on the same ground. Each of these three motions was opposed by

dismissed because of the asserted failure to afford him the speedy trial guaranteed by the Sixth Amendment. Neither McCarthy nor his counsel made a single request for a postponement during the period between McCarthy's arrest and his long-delayed trial. *Id.* at 1295.

When McCarthy was finally brought to trial, on November 3, 1976, a mistrial resulted. On January 11, 1977, McCarthy was retried. At trial, the state sought to prove that McCarthy, although not physically present at the scene of the murder, had aided and abetted Jean Siretz, who actually shot the victims. The state's principal witness was Siretz, who had earlier pleaded guilty to the murder and attempted murder charges, and was sentenced to prison for a period of seven and one-half to fifteen years. On February 2, 1977, McCarthy, who was alleged to have solicited Siretz's action, was found guilty of the murder itself, and of attempted murder, pursuant to C.G.S. § 53a–8. On March 18, 1977 he was sentenced to concurrent terms of imprisonment of 10 to 20 years, and 25 years to life. Recommended Decision at 1294.

After sentencing, McCarthy appealed his conviction, alleging, *inter alia,* that his right to a speedy trial, as guaranteed by the United States and Connecticut Constitutions, had been violated. On September 4, 1979, the Supreme Court of the State of Connecticut affirmed McCarthy's conviction, and, on September 18, 1979 that court denied McCarthy's motion to reargue his case. *State v. McCarthy,* 179 Conn. 1, 425 A.2d 924 (1979); Recommended Decision at 1293.

Having failed to obtain relief from the Supreme Court of Connecticut, McCarthy, on April 28, 1980, filed a petition for a writ

of habeas corpus in the United States District Court for the District of Connecticut. On September 15, 1980, McCarthy's petition was referred to Magistrate Eagan for hearing and a recommended decision.

On October 29, 1981, after an evidentiary hearing and extensive briefing, the magistrate filed his recommended decision. He concluded that McCarthy had exhausted his state remedies and, therefore, that the district court could properly entertain his constitutional claims. Recommended Decision at 1298–1299. The magistrate then applied the test enunciated by the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), to determine whether an individual's right to a speedy trial had been violated. He found that the length of McCarthy's pretrial incarceration was presumptively prejudicial, Recommended Decision at 1300; that McCarthy had vigorously and timely sought a speedy trial, *id.* at 1300–1301; and that there was no acceptable justification for the delay. *Id.* at 1304. In addition, the magistrate found that the lengthy delay in bringing McCarthy to trial had caused McCarthy actual and substantial prejudice. *Id.* at 1305; *see generally id.* at 1299–1309. For these reasons, the magistrate held that McCarthy's federal constitutional right to a speedy trial had been violated, and recommended that the court grant McCarthy's petition for a writ of habeas corpus and thereby release him from prison. *Id.* at 1308–1309.

No objection was filed to the recommended decision. In the absence of the court's approval of the recommended decision (for reasons stated in the record and partly set forth in the margin),[5] counsel for petitioner on December 10, 1981 filed a

---

the state and denied by the Superior Court on January 21, 1976, July 20, 1976 and September 30, 1976, respectively. On November 3, 1976, prior to the commencement of his first trial, McCarthy orally renewed the third motion to dismiss in Superior Court; the motion was opposed by the state and denied by that court on that date. *See* Recommended Decision at 1294–1295. On November 16, 1976, after his trial (which began on November 3, 1976) had resulted in a mistrial, McCarthy orally moved in

Superior Court for an immediate trial. Nevertheless, McCarthy's second trial was delayed for almost two months, until January 11, 1977, on which date McCarthy again orally renewed in Superior Court his third motion to dismiss for want of a speedy trial. This renewed motion was also opposed by the state and denied by the Superior Court. *Id.*

**5.** The court's reluctance to adopt the Recommended Decision, despite the respondent's failure to file an objection, *see* Findings of Fact

motion for immediate review and acceptance of the recommended decision. The court then scheduled a hearing on the recommended decision for January 13, 1982.

(filed Dec. 3, 1982) ("Findings") at ¶¶ 28–44; 28 U.S.C. § 636(b)(1)(C); Rule 2, Local Rules for United States Magistrates, District of Connecticut ("Local Rules for Magistrates"), was described by the court at the hearing held on February 4, 1982, shortly after the motion to alter or amend judgment was filed:

> The matters which set this case apart, perhaps, as far as the general public is concerned, begin in late October, 1981. It was on October 29, 1981 that Magistrate Eagan filed his Findings of Fact and Recommended Decision in which he found in McCarthy's favor—that is, in favor of McCarthy's claim that his constitutional right to a speedy trial had been violated. He recommended that I issue a writ of habeas corpus, vacating [McCarthy's] state conviction and releasing McCarthy from prison.
>
> \*   \*   \*   \*   \*   \*
>
> In any case, it is clear that if the State objected to the Magistrate's Recommended Decision—if the State had any reservations at all about what the Magistrate had written on October 29, 1981, if the State did not want McCarthy released—it would have to file an objection in this court by no later than November 13, 1981.
>
> \*   \*   \*   \*   \*   \*
>
> November 13, 1981—that date came and that date went, with not a word from the State of Connecticut. Ordinarily, absent some clear and significant error of law, a Judge may simply accept a recommended decision in the absence of a timely objection. Indeed, the local rules of this court explicitly provide for such action by a Judge.
>
> As it happens, I did not do that. I delayed acting in this matter, in the belief that perhaps the State of Connecticut was merely dilatory, excusably dilatory, or that there might be some other reason for delay in objecting to a recommended decision which so clearly raised serious questions about the way the ship of state is being run. I waited and I waited. Still no word from the State of Connecticut.
>
> I was, to say the least, puzzled by the State's inaction. . . .
>
> \*   \*   \*   \*   \*   \*
>
> . . . I found it hard to believe that the State was raising no objection to the Magistrate's Recommended Decision. Without intimating any view on the character of that decision, it was obviously an important decision, and I was surprised that no objection had been raised to it. Perhaps because I found it hard to believe that the State was raising no objection, I did not promptly act on the matter . . . . [C]alls from my chambers to the

At that hearing, the duly authorized counsel for respondent, *see* Findings of Fact (filed Dec. 3, 1982) ("Findings") (unpublished) ¶¶ 30, 36–37, 42–43, 54, asked the

> State's lawyers produced no response adverse to McCarthy.
>
> Six weeks after the Magistrate's Recommended Decision, Mr. Sheldon, McCarthy's able and alert lawyer, filed a motion for immediate review and acceptance of the Magistrate's Findings of Fact and Recommended Decision. Clearly, Mr. Sheldon was becoming impatient with the Court's delay . . . . Then, some days after he filed [the] motion for immediate review and acceptance of the Magistrate's Findings of Fact and Recommended Decision—that is, on December 21, 1981—Mr. Sheldon, vigorously doing his job of representing McCarthy, petitioned for McCarthy's admission to bail . . . .
>
> I carefully reviewed Mr. Sheldon's papers, but I did not act, in the belief that perhaps now the State's lawyers might have something to say on this matter. After several calls from my chambers to the State's lawyers indicated anew that the State quite clearly had no interest in objecting to Magistrate Eagan's Recommended Decision, I still did not endorse the Recommended Decision, and I still did not grant Mr. Sheldon's motion for bail for McCarthy.
>
> Instead, I scheduled a hearing on all pending matters, at which I could hope to hear, in open court and on the record, whatever it is that the State had to say on this matter. Interestingly enough, it was reported to me by my clerks that the State's lawyers had indicated to them that they could not understand why I was holding a hearing in this case, in view of the fact that they had not opposed the release of McCarthy.
>
> I decided to hold the hearing, anyway.
>
> That hearing was scheduled for January 13, 1982. . . . The hearing . . . lasted about an hour.
>
> \*   \*   \*   \*   \*   \*
>
> [T]he parties had implicitly, and now explicitly, informed the Court that there was no dispute between them—that both parties wanted the Judge to enter a judgment in favor of McCarthy so that McCarthy could go free.
>
> However, out of an excess of caution born[ ] of a skeptical nature, I then said to Mr. Jacobson the following, and I read now from Page 45 of the transcript, verbatim:
>
> "And you are authorized to speak in behalf of the relevant state authorities?" He answered: "That is correct, your Honor. I am the Assistant State's Attorney in Fairfield County. I have discussed this matter with Mr. Donald Browne, who is the State's Attorney." . . . .

court to enter judgment in favor of McCarthy, to grant McCarthy's habeas petition, and to release McCarthy from custody. *Id.* ¶¶ 45–47. The state's attorney stated that he agreed that McCarthy's right to a speedy trial, as guaranteed by the United States Constitution, had been violated, although he did not concur with every aspect of Magistrate Eagan's recommended decision. *Id.* ¶¶ 31–36, 43; *see* Certified Official Transcript of Hearing Held on January 13, 1982 (filed Jan. 21, 1982) ("Tr. Jan. 13, 1982") at 44–49. The state's attorney, who had had significant experience in the handling of habeas cases and who was familiar with questions regarding the requisite exhaustion of state remedies,

Findings ¶¶ 13–24, acted after having made an independent assessment of McCarthy's exhaustion claim and after having concluded that McCarthy had indeed exhausted his state remedies before seeking relief in the federal court. *Id.* ¶¶ 31–32; *see also id.* ¶¶ 18, 43–44.

Both petitioner and respondent agreed that the court should enter judgment for McCarthy and release him by adopting the result recommended by the magistrate. *Id.* ¶¶ 35–37, 42–48; Tr. Jan. 13, 1982 at 40–49. Accordingly, on January 15, 1982, the court adopted the magistrate's recommended decision pursuant to the agreement and consent of counsel for both parties.[6] Judgment

---

A few moments later, I again pursued this question of the State's position on the release of McCarthy with Mr. Jacobson, the Assistant State's Attorney. I asked him, and I read now from Page 48 of the transcript:

"So you would have the Court adopt these findings of fact and the recommended decision on the narrowest possible grounds, which in this case would be the absence of an objection by the State under the Local Rules for United States Magistrates?" Mr. Jacobson concurred, and then he added:

"I would even go one step further. I think that even when you win cases, they sometimes have a cleansing effect. When we argued this case in the Supreme Court of Connecticut and the five judges upheld the judgment and found no violation of speedy trial, it came back as a message to us, that, you know, things have to get moved faster; you can't leave an individual in Mr. McCarthy's position without a trial when he is constantly seeking one, and so forth."

. . . I then said to Mr. Jacobson, at Page 48 of the transcript:

"So, in effect, the State of Connecticut would have the Court issue the writ of habeas corpus forthwith?" To which Mr. Jacobson replied: "I would find no fault with that, your Honor."

Did I decide the matter then and there? Was there a proverbial rush to judgment? No. I decided to wait a couple of days, to see if the State might have a different view, for some reason beyond my [ken] or reach. This was the last of a long series of opportunities that this Court gave the State of Connecticut to object to McCarthy's release.

I believe this was a fairly clear-cut example of federal judicial restraint. Great deference was shown to the State authorities, and in particular great deference was shown to the State judiciary, which obviously had made many [of the] decisions in question to begin with. Indeed, at the threshold, it seems to

me that if anyone might have a reason to complain about anything, it might be Mr. Sheldon, who for many weeks had been pressing for the Court to act in the absence of the State's objection and in the face of the State's obvious acquiescence.

Finally, because of all of the circumstances I have outlined and because Magistrate Eagan's Recommended Decision was not clearly erroneous or contrary to law, on Friday, January 15, 1982, I issued a ruling adopting the result that Magistrate Eagan had recommended. In that ruling I explicitly noted the failure of the State to file a timely objection. I also flatly stated that at the hearing of January 13, 1982 the State of Connecticut had agreed to the release of McCarthy. Accordingly, I ordered McCarthy's release.

\* \* \* \* \* \*

[I was thus surprised,] I confess, [by] the papers filed on January 27 and January 28, by the State of Connecticut. . . .

Certified Official Transcript of Hearing Held on February 4, 1982 (filed Feb. 16, 1982) ("Tr. Feb. 4, 1982") at 22–34.

6. The full text of the court's order of January 15, 1982, is as follows:

Respondent failed to file a timely objection to the recommended decision of Magistrate Eagan. *See* 28 U.S.C. § 636(b)(1)(C) and Rule 2, Local Rules for United States Magistrates. Moreover, counsel for respondent represented at a hearing held in open court and on the record on January 13, 1982 that respondent had no objection to Magistrate Eagan's recommended decision and that respondent regarded the recommended decision, as applied to this petitioner, to be correct. Counsel for both parties having effectively stipulated to the entry of judgment for petitioner in accordance with the recommended decision of Magistrate Eagan (as stated by counsel for both sides at the hear-

in favor of McCarthy was entered on January 18, 1982; the judgment was amended on January 19, 1982 solely for the purpose of stating with particularity that the judgment was entered at the urging of counsel for both respondent and petitioner and with their consent. No appeal was taken from either the January 18, 1982 judgment or the January 19, 1982 amended judgment and respondent reports that the state of Connecticut released McCarthy from prison on January 18, 1982 pursuant to the judgment entered on that date. Memorandum in Support of Respondent's Renewed Motion for Stay of Execution (filed Aug. 24, 1982) at 2.

Shortly after the entry of the judgment by consent, and after McCarthy's release from prison, the Chief State's Attorney of the State of Connecticut discussed this court's decision with the Chief Court Administrator of the State of Connecticut. *See* Findings ¶¶ 50–54; Certified Official Transcript of Hearing Held on May 5, 1982 (filed May 25, 1982) ("Tr. May 5, 1982") at 175–185. Following that discussion, the Chief State's Attorney reviewed the state and federal proceedings involving McCarthy, and on January 26, 1982, the Office of the Chief State's Attorney, *see* Findings ¶¶ 1–5, filed and served a motion to alter or amend the judgment of the court pursuant to Rule 59(e), Fed.R.Civ.P.

The parties thereafter filed memoranda on the motion. Among the issues raised by those memoranda was whether the motion had been filed in a timely fashion and in proper form under applicable rules. On February 4, 1982, the court held a hearing on the motion, after which further briefing by the parties was scheduled. On February 19, 1982, petitioner moved for an evidentiary hearing, and on March 1, 1982 that motion was granted. Following a hearing on May 5, 1982[7] and the submission of memoranda and proposed findings of fact in late June 1982, the motion was submitted for decision.[8]

---

ing of January 13, 1982), and no objection having been interposed by respondent, the court hereby accepts and approves the result recommended by Magistrate Eagan on October 29, 1981. Accordingly, the petition of Robert J. McCarthy for a Writ of Habeas Corpus is granted to the extent that the judgment of conviction is vacated and the petitioner shall forthwith be discharged from custody.

IT IS SO ORDERED.

/s/José A. Cabranes
José A. Cabranes, U.S.D.J.
January 15, 1982
Hartford, Connecticut

**7.** The evidentiary hearing originally scheduled for April 6, 1982 was postponed because of blizzard conditions.

**8.** At this juncture, it may prove helpful to review the various substantive motions submitted by both parties since the filing of the magistrate's recommended decision on October 29, 1981. On December 10, 1981 petitioner filed a Motion for Immediate Review and Acceptance of Findings of Fact and Recommended Decision. That motion prompted the hearing held by the court on January 13, 1982. On January 15, 1982, the court granted petitioner's motion with the consent of respondents, and on January 18, 1982 judgment was entered in favor of petitioner. On January 19, 1982, judgment was amended.

Thereafter respondent filed motions for the first time since issuance of the magistrate's recommended decision. Those motions consisted of: a Motion to Open and Amend Judgment (filed Jan. 26, 1982), a Motion for Stay of Execution (filed Jan. 27, 1982), a Motion for Expedited Hearing and Ruling on the Respondent's Motion for Stay of Execution (filed Jan. 29, 1982), and a Motion for Ruling on the Applicability of Rule 62(a) (filed Jan. 29, 1982). The last-mentioned motion was denied by the court on January 29, 1982. On February 1, 1982, respondent filed an Amended Motion for Stay of Execution and Order of Reincarceration. On February 4, 1982 the court held a hearing on the Motions to Open and Amend Judgment and for Stay of Execution. On February 9, 1982, respondent withdrew its Amended Motion of February 1, 1982 and filed a Motion for Expedited Hearing, which was granted by the court. On March 1, 1982, respondent filed a Motion for Reconsideration. After several delays, occasioned by petitioner's request for an evidentiary hearing and by the withdrawal of Mr. Jacobson's appearance in the case as well as by inclement weather, *see* note 7 *supra,* the hearing was finally held on May 5, 1982. At that hearing, the Amended Motion for Stay of Execution and Order of Reincarceration was pressed by respondent and denied by the court. The original Motion for Stay of Execution was also denied, as moot, having been superseded by the Amended Motion. In denying those motions, the court or-

*Discussion*

The decision whether to alter or amend a judgment pursuant to a proper motion under Rule 59(e) is within the discretion of the district court. 6A Moore's Federal Practice ¶ 59.15[4] at 59–294 n. 9 (1982); *see also Quality Prefabrication, Inc. v. Daniel J. Keating Co.*, 675 F.2d 77, 78 (3d Cir.1982). In the exercise of that discretion, the court determines that respondent's motion must be denied. Respondent failed to file a timely objection to the magistrate's recommended decision. After consenting to the entry of judgment, respondent failed to show that new or unforeseen conditions required the court to alter or amend the judgment so entered. Finally, respondent's underlying claim, that petitioner had failed to exhaust state remedies, was effectively waived by the state's attorney.

### I.

Assuming that the motion to alter or amend the judgment was properly served,[9] the court is required to deny the

---

dered that their denial be without prejudice to renewal by respondent in the event respondent did not pursue appellate or other remedies. Respondent's Motion for Reconsideration was denied as moot on May 26, 1982. The various hearings sought by respondent having been held, the only substantive motion that remained pending at the end of May was the Motion to Open and Amend Judgment.

Thereafter, only one further substantive motion was filed, respondent's Renewed Motion for Stay of Execution (filed Aug. 25, 1982). It is apparent that that motion renews respondent's previous Motion for Stay of Execution (filed Jan. 27, 1982). *See* Memorandum in Support of Respondent's Renewed Motion for Stay of Execution (filed Aug. 24, 1982) at 3. The earlier motion makes clear that the stay is sought during the pendency of respondent's Motion to Open and Amend Judgment, which is the subject of the instant decision. Accordingly, the Renewed Motion for Stay of Execution will be denied as moot, concurrently with issuance of the present ruling.

9. The motion to alter or amend judgment might well be dismissed on narrow procedural grounds alone. Rule 59(e), Fed.R.Civ.P., provides that a motion of this sort "shall be served not later than 10 days after entry of the judgment." (Although the motion in question could conceivably be deemed made under Rule 60(b) rather than Rule 59(e), respondent has argued that its motion ought to be considered one made under Rule 59(e), Respondent's Brief on Questions Propounded by the Court [filed Mar. 8, 1982], at 11–13, and the court will therefore defer to the movant's characterization of its papers). This ten-day limit, intended to protect the finality of a judgment, is jurisdictional. It may not be altered, waived, or amended by the court. *See* Rules 6(b) and 59(e), Fed.R. Civ.P.; *Gribble v. Harris*, 625 F.2d 1173, 1174 (5th Cir.1980); *Scola v. Boat Frances, R., Inc.*, 618 F.2d 147, 154 (1st Cir.1980). *See also Browder v. Director*, 434 U.S. 257, 271, 98 S.Ct. 556, 564, 54 L.Ed.2d 521 (1978) ("Rule 59 in particular is based on an 'interest in speedy disposition and finality' ").

In the present case, the court entered judgment on January 18, 1982, and filed an amended judgment on January 19, 1982. On January 26, 1982, eight days after entry of the judgment, respondent served a document styled a Motion to Open and Amend Judgment pursuant to Rule 59(e), Fed.R.Civ.P. The only description of the grounds to alter or amend the judgment was that

[t]his motion is based upon compelling reasons related to the relationship between the state and federal government which shall be set forth in a memorandum of law to be filed with this Court.

*See* note 13, *infra* (on specificity requirements for "objections" to a magistrate's recommended decision). The memorandum of law to which the motion referred was not served until February 1, 1982, fourteen days after entry of the judgment.

A motion to alter or amend judgment is, of course, subject to Rule 7(b)(1), Fed.R.Civ.P., which requires, *inter alia*, that a motion "shall state with particularity the grounds therefor." Professor Moore has noted the prevailing view that "the purpose of the time limitation [such as that of Rule 59(e) ] would be defeated if a party could file a skeleton motion and later fill it out[,] or add new grounds." 2A Moore's Federal Practice ¶ 7.05 at 1543–1544 (1982) (footnote omitted). While "[r]easonable specification is all that the requirement of particularity imposes," *id.* at 1543; *see Martinez v. Trainor*, 556 F.2d 818, 820 (7th Cir.1977) (per curiam), a federal court cannot be called upon to lend content to an otherwise cryptic motion by some combination of conjecture, cross-referencing and second-guessing.

The respondent's January 26, 1982 motion provided no particularity at all. Nowhere did it state, even in conclusory terms, the legal basis for the relief sought. Nowhere did it state, for example, that it sought to raise the issue of exhaustion of state remedies. A mere allusion to the "relationship between the state and federal government" cannot satisfy the requirement of particularity stated in Rule 7(b)(1), because virtually all federal constitutional claims raised in a post-conviction attack on a state criminal proceeding may be embraced by that broad phrase.

motion without reaching the merits of the respondent's asserted objections to the magistrate's recommended decision; the respondent having failed to file and serve a timely objection to the recommended decision, cannot obtain an opportunity to relitigate the recommended decision by filing a Rule 59(e) motion after the entry of final judgment.

The Memorandum in Support of the State's Motion to Open and Amend Judgment (served Feb. 1, 1982) was served more than ten days after entry of the amended judgment (and *a fortiori* more than ten days after entry of the original judgment). Even if the particularity requirements for a motion established in Rule 7(b)(1) could be met by the filing of a supporting memorandum, the statement of the grounds for the Rule 59(e) motion came too late: having been served outside the ten-day limit provided by law, the February 1, 1982 memorandum could not belatedly cure the jurisdictional defect of the non-particularized motion originally served. To hold otherwise would defeat "the purpose of the time limitation" by permitting a party to "file a skeleton motion and later fill it out[.]" 2A Moore's Federal Practice ¶ 7.05 at 1543–1544 (1982).

The Motion for Stay of Execution (served Jan. 27, 1982) and the Memorandum in Support of Motion to Stay Execution of the Judgment Pending Decision on the Motion to Open and Amend the Judgment (served Jan. 28, 1982) also cannot cure the jurisdictional defect of the motion as filed. The Motion for Stay of Execution (served Jan. 27, 1982) was served within the relevant ten-day period, but it was filed pursuant to Rule 62(b), Fed.R.Civ.P., and the Chief State's Attorney has conceded that it "is a separate motion" from the motion to open and amend. Tr. Feb. 4, 1982 at 50–51. The plain language of Rule 7(b)(1) requires a motion itself to "state with particularity the grounds therefor," and there is no suggestion in that rule or any other authoritative text that the particular grounds for a motion may be discovered in other motions or in memoranda filed in support of other motions. A contrary rule would place the burden on the court and on adversary counsel to search the full record of a case in order to discover any possible grounds to support an otherwise defective motion, thus defeating the straightforward requirement that the motion itself "state with particularity the grounds therefor."

It should also be noted that the respondent's Rule 59(e) motion also failed to comply with Rule 9(c), Local Rules of Civil Procedure, which provides that

[i]n cases involving disputed issues of law, a brief outlining the claims of law and authority pertinent thereto shall be filed and served

The statute pursuant to which this case was referred to Magistrate Eagan permits a district judge to "designate a magistrate to conduct hearings . . . and to submit to a judge of the court proposed findings of fact and recommendations[.]" 28 U.S.C. § 636(b)(1)(B). The goal of the federal statute providing for the assignment of cases to magistrates [10] is to " "in-

by the movant *with his motion papers.* (emphasis supplied).

As it is not disputed that the claims apparently sought to be raised in the Motion to Open and Amend Judgment (as those claims were explained in the record of this case weeks and months following the filing of the motion) involved "disputed issues of law," the motion would have been properly served under Local Rule 9(c) only if it had been filed with a brief. Inasmuch as the respondent did not file a brief until February 1, 1982, the motion to alter or amend the judgment was not properly served until that date. By that date, however, the ten-day jurisdictional limit set by Rule 59(e), Fed.R.Civ.P., had expired.

10. In support of its argument that the failure to object to a magistrate's recommended decision is of minor importance, respondent claims that "the magistrate's role in habeas matters is akin to that of a judge's law clerk." Respondent's Brief on Questions Propounded by the Court (filed Mar. 8, 1982) at 4. Respondent is wrong, as the legislation on the magistrate's system, and its actual operations, amply confirm. Respondent relies in part on *Wingo v. Wedding,* 418 U.S. 461, 473 n. 18, 94 S.Ct. 2842, 2849 n. 18, 41 L.Ed.2d 879 (1974) (quoting S.Rep. No. 371, 90th Cong., 1st Sess. 26 [1967] ); *see* Respondent's Brief, *supra,* at 4. Even assuming that *Wedding* were still good law, as to which there is considerable doubt, *see, e.g., Orand v. United States,* 602 F.2d 207 (9th Cir.1979), the passage in *Wedding* relied upon by respondent does not support respondent's argument. The Senate Report quoted by the Court noted that before 1967 the examination of post-conviction review applications had been entrusted by many judges to their law clerks; that "judges have noted that the normal 1-year clerkship does not afford law clerks the time or experience necessary to attain real efficiency in handling such applications"; and that the adoption of the Federal Magistrate's Act would facilitate the judges' decisions in habeas corpus cases by placing these matters in the hands of a "qualified, experienced magistrate [who] will, it is hoped, acquire an expertise in examining these [post-conviction review] applications and summarizing their important contents for the district judge[.]" Magistrates are subordinate judicial officers and their functions in matters relating to applications for the writ of habeas corpus and other matters is not "akin to that of

creas[e] the overall efficiency of the federal judiciary,'" *Nettles v. Wainwright,* 677 F.2d 404, 406 (Former 5th Cir.1982) (en banc) (quoting S.Rep. No. 12, 90th Cong., 1st Sess. 11 [1967]) while preserving for litigants the opportunity to have their claims heard by a district judge. *See Sick v. City of Buffalo,* 574 F.2d 689, 692–693 (2d Cir.1978). To further these goals, parties are afforded an opportunity to obtain de novo review of a magistrate's recommended decision, but only if they file objections within certain time limits. 28 U.S.C. § 636(b)(1). Requiring a de novo determination absent the filing of a timely objection "would defeat the main purpose of the [federal statute permitting referral to magistrates.]" *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 605 (1st Cir.1980). *See also United States v. Vega,* 678 F.2d 376, 379 (1st Cir.1982) (per curiam) (extending the rule of *Park Motor Mart* to criminal cases; "not only was there no objection to the magistrate's report, but defense counsel moved that it be adopted. And the court, noting first that no objections had been filed, did so.").[11]

Both the federal statute and the rules of procedure governing federal habeas corpus cases require the filing of an objection within ten days of *service* of a magistrate's recommended decision. 28 U.S.C. § 636(b)(1); Rule 8(b)(3), Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Corpus Rules"). The rules for magistrates in this district require the filing and service of objections,

if any, within fifteen days after the *filing* of the recommended decision. Rule 2, Local Rules for United States Magistrates, District of Connecticut ("Local Rules for Magistrates"). Under these various rules, a party who files a timely objection to a magistrate's recommended decision receives a "de novo determination" of the matters to which he has objected.

■ The authority of the district judge to accept, reject, or modify a magistrate's recommended decision is clear, 28 U.S.C. § 636(b)(1); Rule 8(b)(4), Habeas Corpus Rules; Rule 2, Local Rules for Magistrates; *Sick v. City of Buffalo, supra,* 574 F.2d at 692–693; *Consorcio Constructor Impregilo v. Mack Trucks, Inc.,* 497 F.Supp. 591, 593 (E.D.Pa.1980), and the authority to "mak[e] final decisions remains at all times with the district judge." *Mathews v. Weber,* 423 U.S. 261, 270, 96 S.Ct. 549, 554, 46 L.Ed.2d 483 (1976). "The district judge is free to follow [the magistrate's recommendation] or wholly to ignore it, or, if he is not satisfied, he may conduct the review in whole or in part anew. The authority—and the responsibility—to make an informed, final determination . . . remains with the judge." *Id.* at 271, 96 S.Ct. at 554. Absent an objection, "the Judge ultimately responsible may forthwith endorse acceptance of the proposed decision, but *may* afford the parties opportunity to object to any contemplated rejection or substantial modification of the proposed decision." Rule 2, Local Rules for Magistrates (emphasis supplied).

a judge's law clerk"; a law clerk is not a judicial officer and is not himself empowered to perform any of the duties entrusted by law to a magistrate.

11. Failure to file timely written objections to a magistrate's findings and recommendations bars the litigant's claim to a de novo determination by the district judge of an issue covered in the magistrate's recommended decision and bars any attack on appeal of findings accepted by the district court, except perhaps on grounds of plain error or manifest injustice. *See, e.g., Nettles v. Wainwright,* 677 F.2d 404, 410 (Former 5th Cir.1982) (en banc). When issued on October 29, 1981, and when approved and confirmed by the district court on January 15, 1982, the magistrate's recommended deci-

sion was not plainly wrong. By the time the district court arguably was in a position to consider the exhaustion principles enunciated on March 3, 1982 by the Supreme Court in *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), the state had already bound itself by its failure to file a timely objection to the magistrate's recommended decision (which was predicated on a finding of exhaustion of state remedies) and by its consent to the entry of judgment in favor of McCarthy. The magistrate's erroneous finding that the state could not waive the exhaustion requirement, *see* Recommended Decision at 1298, does not, of course, negate the effect of the state's consent to the entry of that judgment.

In this case, the recommended decision was issued on October 29, 1981. Respondent filed no objection to the decision, timely or otherwise. Counsel for respondent, Richard F. Jacobson, an experienced attorney familiar with the general questions of law raised in this case and familiar also with the particular facts of McCarthy's prosecution, Findings ¶¶ 13, 17–48, was fully authorized to act as attorney for respondent, *id.* ¶¶ 30, 34–37, and was familiar with the law of habeas corpus, *id.* ¶¶ 13–24, and the procedures governing recommended decisions of United States magistrates. *Id.* ¶¶ 38–41. Jacobson concluded, after reviewing the recommended decision, that the petition for a writ of habeas corpus should be granted. *Id.* ¶ 32. After consulting with his immediate superior (the State's Attorney for the Judicial District of Fairfield), *id.* ¶¶ 33–35, who agreed with his view of the case, *id.* ¶ 35, Jacobson decided not to file objections to the recommended decision and decided to consent to the entry of judgment for petitioner because that was "the proper course to follow." *Id.* ¶¶ 32, 35, 40–41. He appeared at a hearing held in open court on January 13, 1982 and consented to the court's adoption of the result of the magistrate's decision. Findings

¶¶ 40–42, 48; Tr. Jan. 13, 1982 at 44–49. Accordingly, on January 18, 1982, the court entered judgment pursuant to the agreement and consent of the parties.[12] It was not until January 26, 1982—89 days after Magistrate Eagan issued his recommended decision and 8 days after the entry of judgment for petitioner—that the Chief State's Attorney questioned the magistrate's view of the case, by serving a motion to alter or amend the judgment under Rule 59(e), Fed. R.Civ.P. The question presented, therefore, is whether a party who fails to file a timely objection to a recommended decision of a magistrate under applicable law may obtain a review of the court's judgment, entered pursuant to the magistrate's recommendation, by serving a Rule 59(e) motion after entry of the judgment.[13]

As a general rule, a party who fails to file a timely objection to all or part of a recommended decision waives its right to further review (including appellate review) of those parts of the recommended decision to which it fails to object. *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.,* 588 F.2d 24, 29–30 (2d Cir.1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979) (waiver of review by district judge

---

**12.** A consent judgment is a "judgment, the provisions and terms of which are settled and agreed to by the parties to the action." Black's Law Dictionary 756 (5th ed. 1979). A "decree" is merely the term for a sentence or order of a court of equity or chancery. *Id.* at 369. As a result of the merger of law and equity the terms "judgment" and "decree" are synonymous, *see* Rule 54(a), Fed.R.Civ.P., although the former is the term generally employed in federal practice. The term "consent decree," while generally used to mean "[a]greement by defendant to cease activities asserted as illegal by government," is also applicable to "a decree entered in an equity suit on consent of both parties[.]" Black's Law Dictionary 370 (5th ed. 1979).

**13.** It has not been suggested that the Rule 59(e) motion filed on January 26, 1982 was, or ought to be considered, an "objection" to the Recommended Decision under the applicable statute and rules. In any event, Rule 2, Local Rules for Magistrates, provides that "[a]ny party wishing to object must, *within 15 days after filing,* serve on all parties, and file with the Clerk, written objection which shall *specifically identify* the ruling, order, proposed findings and conclusions, or part thereof to which

objection is made and *the factual and legal basis for such objection.*" (emphasis supplied). These requirements are not without significance. *See, e.g., John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.,* 588 F.2d 24, 29–30 (2d Cir.1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979) (construing Rule 2, Local Rules for United States Magistrates, District of Connecticut, and holding that, even where a party did file a timely objection to the magistrate's conclusion, it waived a right to appeal to the district judge or the Court of Appeals matters as to which it had failed to "specifically identify the ... legal basis" for its challenge). *See* note 9, *supra* (description of the grounds originally stated for the motion to alter or amend). Accordingly, quite apart from the limitations of time imposed by statute and rules on the filing of objections to recommended decisions of magistrates, *see* note 9, *supra,* the January 26, 1982 motion to alter or amend filed under Rule 59(e) cannot possibly be regarded as an "objection" to a magistrate's recommended decision that meets the specificity requirements stated in Rule 2, Local Rules for Magistrates.

and Court of Appeals, interpreting 28 U.S.C. § 636(b)(1) and the specificity requirements of Rule 2, Local Rules for Magistrates). *See also McCall v. Andrus,* 628 F.2d 1185, 1187 (9th Cir.1980), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1700, 68 L.Ed.2d 197 (1981) (waiver of appellate review); *Park Motor Mart, Inc. v. Ford Motor Co., supra,* 616 F.2d at 605 (waiver of appellate review); *Consorcio Constructor Impregilo v. Mack Trucks, Inc., supra,* 497 F.Supp. at 594 (waiver of review by the district court); *Webb v. Califano,* 468 F.Supp. 825, 830–831 (E.D.Cal.1979) (waiver of review by the district court; "[h]aving failed to object within the time provided, the parties cannot mandate a de novo review; they may only suggest it.")

Those circuits which have deviated from this general rule of waiver have done so merely to hold that a party waives the right to appeal by failing to file a timely objection only in those cases "where it is evident" that the party has been informed of the requirement that it file a timely objection. *See Nettles v. Wainwright, supra,* 677 F.2d at 408, 410. *See also United States v. Walters,* 638 F.2d 947, 949–950 (6th Cir. 1981) (same). However, even under the notice requirements imposed by the Fifth and Sixth Circuits in the exercise of their supervisory powers—requirements apparently not imposed by the Second Circuit—it is clear that respondent in this case knowingly waived his right to have the district court review the magistrate's recommended decision; respondent's experienced counsel elected not to object to the recommended decision, fully knowing the consequences of his election. Findings ¶¶ 32, 36–41. *See also* Tr. Feb. 4, 1982 at 114–115. No authority has been brought to the court's attention to support the notion that a party who has consciously and deliberately elected not to file a timely objection to a magistrate's recommended decision is permitted to circumvent this well-established principle of waiver by the filing of a timely Rule 59(e) motion, much less by the filing of an untimely and improperly filed Rule 59(e) motion. *See* note 9, *supra.*

## II.

Even as the state's resolve appears to have wavered with respect to the magistrate's recommended decision, so has the state vacillated in its attitude toward this court's judgment. As of January 19, 1982, that judgment reflected the consent and urging of both parties. A judgment entered with the consent of the parties has, of course, the same force and effect as any other judgment, *Securities and Exchange Commission v. Thermodynamics, Inc.,* 319 F.Supp. 1380, 1382 (D.Colo.1970), *aff'd,* 464 F.2d 457 (10th Cir.1972), *cert. denied,* 410 U.S. 927, 93 S.Ct. 1358, 35 L.Ed.2d 588 (1973); *Nashville, C. & St. L. Ry. Co. v. United States,* 113 U.S. 261, 266, 5 S.Ct. 460, 462, 28 L.Ed. 971 (1884). At the same time, a decree entered by consent of the parties is basically contractual in nature, *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975), and ordinarily may not be modified without consent of the parties, *Columbia Artists Management, Inc. v. United States,* 381 U.S. 348, 352, 85 S.Ct. 1553, 1555, 14 L.Ed.2d 679 (1965). *See generally United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). Because of the interest in finality shared by both parties, by the court, and by society in general, the fact that one party's consent was defective will not usually suffice to disrupt the decree, *see Gilbert v. United States,* 479 F.2d 1267 (2d Cir.1973) (per curiam).

On January 26, 1982, the state launched what was then an obscure attack (later clarified somewhat, *see* note 9, *supra*) on the judgment that had been entered with its consent. Yet the state did not then give, and has not since given, any reason why this court should not apply to the case at bar the often-cited principle stated by Justice Cardozo a half-century ago: "Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned." *United States v. Swift & Co., supra,* 286 U.S. at 119, 52 S.Ct. at 464. The court's amended judgment of January

19, 1982 had put to rest a matter that had been pending for nearly two years, had generated a voluminous file and necessitated numerous hearings, and had finally been resolved with the agreement of all concerned. The state has never alleged that between January 19 and January 26, 1982, there arose "new and unforeseen conditions" of any variety, much less ones evocative of "grievous wrong."

Justice Cardozo's words were, of course, written with reference to an antitrust consent decree in which important issues of public policy were at stake. The case at bar is not one in which vast sums of money ride on the judgment, nor one in which industrial reorganization will flow from the decision. Nevertheless, a petition for a writ of habeas corpus does involve the court in a quasi-criminal proceeding, and such matters have always been regarded as especially serious by our Constitution and legal system. Accordingly, the importance of finality in criminal matters has been reaffirmed by various doctrines. The constitutional guarantee that a defendant will not be exposed to double jeopardy is one aspect of that concern, *see United States v. Wilson,* 420 U.S. 332, 343, 95 S.Ct. 1013, 1021, 43 L.Ed.2d 232 (1975), while the recently strengthened view of a plea bargain as a contract capable of specific enforcement derives from the related principle that both prosecutor and defendant will act only after the greatest deliberation and with the recognition that their actions, once taken and recorded before the court, will not lightly be subject to retraction. *See, e.g., Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *Siegel v. New York,* 691 F.2d 620 (2d Cir.1982).

The gravity of any criminal proceeding, let alone a prosecution for murder, makes considered determination by the prosecution, no less than by the court, an absolute necessity. It would undermine both the significance of the proceeding and the dignity of the state itself for this or any other court to be forced to assume that the state's consent to judgment, once given, could casually be withdrawn.

### III.

#### A.

Perhaps recognizing that consent properly given cannot readily be withdrawn, respondent now in effect contends that it never consented to entry of the judgment in the first place. It argues that it could not have properly consented to judgment in this case because petitioner had not exhausted state remedies, and "that the absence of exhaustion cannot be waived or stipulated to, or conceded by the state." Memorandum in Support of the State's Motion to Open and Amend Judgment (filed Feb. 1, 1982) at 9–10. *See United States ex rel. Sostre v. Festa,* 513 F.2d 1313, 1314 n. 1 (2d Cir.), *cert. denied,* 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975). *See also United States ex rel. Trantino v. Hatrack,* 563 F.2d 86, 96 (3d Cir.1977), *cert. denied,* 435 U.S. 928, 98 S.Ct. 1499, 55 L.Ed.2d 524 (1978).

Respondent now claims that the exhaustion requirement of 28 U.S.C. §§ 2254(b), (c),[14] has not been satisfied because petitioner failed to present fully the factual basis of his claim before the state courts. Memorandum in Support of the State's Motion to Open and Amend Judgment (filed Feb. 1, 1982) at 2. However, at the very onset of the federal habeas corpus case respondent had admitted petitioner's claim that "[p]etitioner has exhausted all the remedies available in the courts of the State of Connecticut as to the claim brought herein." *See* Petition for Writ of Habeas Corpus (filed Apr. 28, 1980) at ¶ 3; Return to Petition for

---

14. 28 U.S.C. § 2254 provides in pertinent part:

(b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

Writ of Habeas Corpus (filed May 19, 1980) at ¶ 2. Moreover, Assistant State's Attorney Jacobson later made an independent assessment of the exhaustion claim and concluded that petitioner had exhausted state remedies and that Magistrate Eagan properly had found that the exhaustion requirement was satisfied. Findings ¶¶ 31–32. It is undisputed on this record that Jacobson has a strong sense of duty and that he does not hesitate to raise the exhaustion claim in behalf of the state where there is merit to the claim. Findings ¶ 18.

The circuits have split on the permissibility of a prosecutorial waiver of the exhaustion requirement. "Since the exhaustion requirement of 28 U.S.C. § 2254 'is not a jurisdictional concept but simply a flexible matter of comity,'" the Fourth Circuit has held that the federal courts may, in the interest of justice and expedition, accept waiver of exhaustion by the state. *Jenkins v. Fitzberger*, 440 F.2d 1188, 1189 (4th Cir. 1971) (per curiam) (citation omitted). *Accord, Houston v. Estelle*, 569 F.2d 372, 375–376 (5th Cir.1978) (same; state explicitly conceded that petitioner had exhausted state remedies). Where the state erroneously conceded in its district court pleadings that state remedies were exhausted, the Eighth Circuit refused to recognize a doctrine of inadvertent waiver of exhaustion, but noted that it had in the past recognized express waiver by the state. *Davis v. Campbell*, 608 F.2d 317, 320 n. 10 (8th Cir. 1979) (per curiam). *See also United States ex rel. Lockett v. Ill. Parole and Pardon Bd.*, 600 F.2d 116, 117 (7th Cir.1979) (per curiam) ("Since the exhaustion requirement is not jurisdictional ... an appeals court may in appropriate circumstances decline to dismiss despite the failure to exhaust, as where there has been a full hearing below and exhaustion would be 'wasteful of judicial energy.'"); *United States ex rel. Trantino v. Hatrack, supra*, 563 F.2d at 95–97 (noting generally the divergence of the interests of state prosecutors and state courts, and acknowledging that "deviation from the exhaustion requirement can only be permitted 'in those rare instances where justice so requires,'" but finding no "rare or extraordinary circumstance" which in that case would permit such deviation).

Our own Court of Appeals approved prosecutorial waiver of the exhaustion requirement in *Colon v. Fogg*, 603 F.2d 403 (2d Cir.1979), ignoring *dicta* in an earlier case that had glancingly suggested that the statutory requirement of exhaustion of state remedies could not, on the facts of that particular case, be waived by the state. *United States ex rel. Sostre v. Festa, supra*, 513 F.2d at 1314 n. 1. *See generally* L. Yackle, Postconviction Remedies § 55 at 240 (1981) ("compliance with the doctrine [of exhaustion] may be conceded or even waived by the state concerned").

In *Colon, supra*, 603 F.2d at 406–407, the state consented to the amendment of the habeas petition to add a claim of ineffective assistance of counsel, and failed to raise the exhaustion issue until after an evidentiary hearing, some fourteen months after the amendment of the petition. The court found the state's newly raised exhaustion claim "close to frivolous." *Id.* at 406.

■ "Close to frivolous" is a phrase that springs to mind when faced with the state's contention that at this late stage—where a judgment has been fully executed following its entry by consent and where no new or unforeseen circumstances are alleged to have arisen in the brief period between entry of judgment and the filing of the motion to alter or amend the judgment— the court should reconsider its exhaustion claims.

**B.**

The authority of state prosecutors to waive the exhaustion requirement must be considered in light of the unusual relationship of the Chief State's Attorney's Office to the Connecticut Judicial Department. *See generally* J. Jacoby, *The American Prosecutor: A Search for Identity* 19–28 (1980). Connecticut is one of the few states that retain the early American constitutional structure in which prosecutors are appointed by judges (rather than popularly elected or appointed by the executive) and in which their office is created in the judi-

cial rather than the executive article of the state constitution. *Id.* Although the American prosecutor is now generally considered an executive officer, in the early republic the prosecutor was "clearly defined as *a judicial figure* .... As a *subsidiary of the courts,* he was considered merely an *adjunct* to the real powers of the courts, the judges." *Id.* at 23–24 (emphasis supplied). The early American arrangement of placing state prosecutors in the judicial branch of government survives in Connecticut to this day; the Division of Criminal Justice is an integral part of the Judicial Department of the State of Connecticut and state prosecutors are all appointed by judges and removable only by judges. *See* Findings ¶¶ 1–8; C.G.S. §§ 51–1b, 51–275 to 51–280, 51–285. *See also* C.G.S. § 51–279 (submission of "estimates of appropriations" by Chief State's Attorney to the Chief Court Administrator).

The reluctance of some federal courts to find that prosecutors have waived the defense that a petitioner has failed to exhaust his state remedies is founded on principles of comity; the exhaustion requirement is said to "minimize friction between our federal and state systems of justice by allowing the State an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights." *Rose v. Lundy,* 455 U.S. 509, 518, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982), *quoting Duckworth v. Serrano,* 454 U.S. 1, 2, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981) (per curiam); *see also Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). These principles accord due "deference and consideration ... to the co-equal judicial systems of the various states," *United States ex rel. Trantino v. Hatrack, supra,* 563 F.2d at 96, and "serve[ ] an interest *not* of state prosecutors but of state courts." *Id.*

Where state prosecutors are wholly independent of the state courts it cannot be presumed that they have adequate incentives fully or vigorously to represent the interests of the state courts. In Connecticut, however, the Division of Criminal Justice is "within" and part of the Judicial Department of the State of Connecticut. Findings ¶ 1; C.G.S. §§ 51–275, 51–276.

The Chief State's Attorney (the head of the Division of Criminal Justice) is an employee of the Judicial Department, the head of which is the Chief Justice of the Supreme Court of Connecticut. Findings ¶ 3; .C.G.S. §§ 51–1b, 51–275, 51–278, 51–279. The Chief Justice of the Supreme Court appoints the Chief State's Attorney, Findings ¶ 4; C.G.S. §§ 51–1b, 51–278(a), and the various state's attorneys are appointed and removable by the judges of the Superior Court. Findings ¶¶ 4, 8; C.G.S. §§ 51–278(b), 51–278(g), 51–285.

The Connecticut system is not one in which the state's attorneys have little or no incentive to protect the interests of the state judiciary in federal habeas corpus proceedings. The Division of Criminal Justice represents the state of Connecticut in all federal habeas corpus proceedings in which state prisoners seek to challenge the constitutionality of their convictions in state courts, Findings ¶¶ 15–16; C.G.S. § 51–277. The Division is required by statute to "participate on behalf of the state in all appellate, post-trial and post-conviction proceedings arising out of the initiation of any criminal action[,] whether or not such proceedings are denominated civil or criminal for other purposes." *Id. See generally,* Findings ¶¶ 1–16. The duties of state prosecutors under Connecticut law, which include the representation of the state in post-conviction proceedings, have been held to be "entirely consistent with *judicial power* as prescribed by [Connecticut's] constitution." *State v. Moynahan,* 164 Conn. 560, 568, 325 A.2d 199, *cert. denied,* 414 U.S. 976, 94 S.Ct. 291, 38 L.Ed.2d 219 (1973) (emphasis supplied). Indeed, the appointment of state's attorneys by the judicial branch of Connecticut's government was upheld against a constitutional attack based, in part, on the principle of separation of governmental powers. *Id. See* C.G.S. Const. Art. 2. The Connecticut Supreme Court held that such appointments were consistent with the duties and powers of the judicial department, as distinguished from those of the executive department:

The functions of a state's attorney are not purely those of an executive officer. As a representative of the people of the

state, he is under a duty not solely to obtain convictions but, more importantly, (1) to determine that there is reasonable ground to proceed with a criminal charge ... (2) to see that impartial justice is done the guilty as well as the innocent; and (3) to ensure that all evidence tending to aid in the ascertaining of the truth be laid before the court, whether it be consistent with the contention of the prosecution that the accused is guilty ....

The state's attorney, thus, is an officer charged with important duties and responsibilities in the administration of justice. *Such duties of a state's attorney are entirely consistent with judicial power as prescribed by our constitution.*

*State v. Moynahan, supra,* 164 Conn. at 568, 325 A.2d 199 (citations omitted) (emphasis supplied).

In rejecting the constitutional attack on the system of appointment of prosecutors by judges, Connecticut's highest court pointed with pride to the enshrinement of this unusual system in 270 years of history. *Id.* at 570, 325 A.2d 199. In these circumstances, it was neither surprising nor improper for the Chief Court Administrator of Connecticut to have consulted with the Chief State's Attorney regarding the writ of habeas corpus sought and obtained by McCarthy in the federal court, Findings ¶¶ 50–55; nor was it surprising or improper that the Chief State's Attorney personally took an interest in the case (however belated) following a conversation with the Chief Court Administrator. *Id.* It is not only clear that the state's prosecutors are part of the Judicial Department of the state government, but also, that in the circumstances presented by this particular post-conviction proceeding, the state's attorneys were mindful of the interests of the Judicial Department of which they form a part. *See, e.g.,* Findings ¶ 46. Assistant State's Attorney Jacobson, in consenting to judgment for petitioner, believed he was protecting the Judicial Department for what he regarded as a more onerous outcome to

this litigation. *Id. See* Recommended Decision at 1300. (Magistrate Eagan "decline[d] for the moment to adopt a rule or plan under which the State must bring a defendant to trial within a specific time frame. Rather, we note to the State our concern for this situation and choose to allow the State to adopt its own remedies rather than constricting its administrative and judicial process with artificial restraints.").[15] By consenting to the judgment entered on January 18, 1982, Jacobson sought to limit the impact of the case, assuring that the decision would be, in his words, "writ[ten] with a fine brush, rather than a broad stroke," Tr. May 5, 1982 at 76.

Questions regarding Connecticut's historic and vaunted system of placing prosecutors within the judicial department of the state government need not be considered at this time. It is sufficient to note that under the Connecticut system state's attorneys may and do represent the interests of the state courts in post-conviction proceedings; that in this case, those interests were represented; and, that, in the representation of those interests, the state's attorneys, after due consideration of the case, concluded (1) that state judicial remedies had been exhausted, and (2) that a judgment should enter for McCarthy because of the state's conceded violation of McCarthy's constitutional right to a speedy trial.

If there is any state in which it can be said that prosecutors adequately represent the interests of the state courts in habeas corpus proceedings before a federal court it is surely Connecticut.

### C.

■ Because of the state's waiver of the exhaustion issue and the various procedural defects in its attempt to raise the issue belatedly, it is not necessary for the court to reach the question of whether petitioner in fact satisfied the exhaustion requirement before coming to federal court. In any event, it is well to recall that the exhaus-

---

**15.** In "accept[ing] and approv[ing] the result recommended by Magistrate Eagan on October 29, 1981," the court on January 15, 1982 intimated no view on, *inter alia,* these statements by the magistrate, and it intimates none in this ruling.

tion doctrine is a doctrine of comity. It is not a license for the state to disregard the rules of procedure applicable to all litigants. Nor is it an injunction that a federal court work overtime to excavate and refine arguments ignored or cast aside by the state.

### Conclusion

For the reasons stated above, the motion to alter or amend judgment is denied.

## FINDINGS OF FACT AND RECOMMENDED DECISION

F. OWEN EAGAN, United States Magistrate:

Petitioner seeks a federal writ of habeas corpus on the asserted ground that he had been denied his constitutional right to a speedy trial in violation of the Sixth and Fourteenth Amendments of the Constitution of the United States. For reasons hereinafter stated, the court finds that petitioner was denied his right to a speedy trial.

Accordingly, the writ of habeas corpus shall be granted.

## BACKGROUND

The petitioner, Robert J. McCarthy, was arrested by the Norwalk, Connecticut police on April 5, 1975 in connection with the shooting of two persons. Subsequently, petitioner was charged with attempted murder in violation of sections 53a–49 (criminal attempt) and 53a–54a (murder) of the Connecticut General Statutes, and murder in violation of sections 53a–54a (murder) and 53a–8 (criminal liability for acts of another) of the Connecticut General Statutes. Petitioner pled not guilty to both charges and elected to be tried by jury.

Petitioner's cases were initially set down for a trial date of July 10, 1975, but at the request of the State were continued until November 3, 1976. Petitioner's trial commenced on November 3, 1976. On November 16, 1976 a mistrial was declared by the court. Petitioner's second trial commenced on January 11, 1977 and on February 2, 1977 petitioner was found guilty of both charges brought by the State. He was sentenced to serve concurrent periods of confinement of 10 to 20 years and 25 years to

life in the Connecticut Correctional Institution at Somers.

The evidence presented by the State at petitioner's trial was based upon the contention that petitioner, though not physically present at the scene of the crime, aided and abetted Jean Siretz in the shooting of Donald and Victoria Stuart. The State's principal witness, Jean Siretz, had earlier pled guilty to the actual shooting of the victims and had been sentenced to 7½ to 15 years in prison.

The Connecticut Supreme Court affirmed the actions of the trial court and denied petitioner's appeal. *State v. McCarthy,* 179 Conn. 1, 425 A.2d 924 (1979). On September 18, 1979, the Connecticut Supreme Court denied petitioner's motion to reargue.

## FINDINGS OF FACT

During the course of three days of evidentiary hearings, this court heard detailed testimony concerning petitioner's claim that he was denied the right to a speedy trial as guaranteed by the Sixth Amendment of the Constitution of the United States. Witnesses included the special public defender appointed to represent petitioner, the attorney retained by petitioner to replace the public defender, the state's attorney who prosecuted the case against petitioner, an acquaintance of petitioner, and petitioner himself. Numerous exhibits were entered into evidence including but not limited to letters written during pretrial incarceration by petitioner to his attorney, a letter from the State's principal witness, Jean Siretz, petitioner's accomplice in the crimes, and three statements made by Jean Siretz to the Norwalk, Connecticut Police. Additionally, the Report of the Chief Courts Administrator, State of Connecticut for the years 1969/1970 and two Reports of the Judicial Department, State of Connecticut for the years 1976 and 1978 were entered into evidence. Finally, petitioner's trial transcripts were made a part of the record. Proposed findings of fact have been offered by both parties and based upon these, its own observations, and its evaluation of the testimony and exhibits offered at the evidentiary

hearing, the court makes the following findings of fact.

## I. LENGTH OF DELAY

1. Petitioner was arrested by the Norwalk, Connecticut police on April 5, 1975 and charged in connection with the shootings of Donald and Victoria Stuart.

2. On April 22, 1975 an information was filed by Donald A. Browne, State's Attorney for Fairfield County, State of Connecticut, charging that petitioner "did intentionally aid one JEAN SIRETZ, while the latter, with intent to cause the death of the said DONALD STUART, did shoot and attempt to cause the death of the said DONALD STUART, in violation of Section 53a–54a and Section 53a–49 of the Connecticut General Statutes."

3. On June 9, 1975 a true bill of indictment was returned by a Fairfield County Grand Jury charging that petitioner "did intentionally aid one JEAN SIRETZ, while the latter, with intent to cause the death of one VICTORIA STUART, did shoot and cause the death of the said VICTORIA STUART, in violation of Section 53a–54a and Section 53a–8 of the Connecticut General Statutes."

4. Petitioner pled not guilty to both charges and elected to be tried by a jury of twelve.

5. Petitioner's initial trial commenced on November 3, 1976, eighteen months and twenty-eight days after his arrest.

6. Petitioner's initial trial ended in a mistrial on November 16, 1976 when Jean Siretz, a prosecution witness, introduced testimony that the court deemed highly prejudicial to petitioner.

7. Petitioner was again brought to trial on January 11, 1977, twenty-one months and six days after his arrest.

8. On February 2, 1977 petitioner was found guilty of both charges and on March 18, 1977 was sentenced to concurrent sentences of 10 to 20 years and 25 years to life in prison.

## II. PETITIONER'S ASSERTION OF HIS RIGHT TO A SPEEDY TRIAL

9. On August 28, 1975 petitioner, by his counsel, Special Public Defender, Joseph M. Brophy, filed a Motion for Speedy Trial in the Connecticut Superior Court in which petitioner requested that his case "be set down immediately for trial." Said motion was opposed by the State and denied by the court on September 16, 1975.

10. On December 19, 1975 petitioner filed a Motion to Dismiss in the Connecticut Superior Court on the ground that the State had failed to afford him a speedy trial in violation of the Sixth Amendment to the Constitution of the United States. Said motion was opposed by the State and denied by the court on January 21, 1976.

11. On June 16, 1976 petitioner filed a second Motion to Dismiss for want of a speedy trial in the Connecticut Superior Court. Said motion was opposed by the State and denied by the court on July 20, 1976.

12. On September 15, 1976 petitioner, represented by new counsel, Attorney Warren A. Luedecker of the law firm of Friedman & Friedman, filed a third Motion to Dismiss in the Connecticut Superior Court on the ground that the State had failed to afford him a speedy trial in violation of the Constitution of the United States and the Constitution of the State of Connecticut. Said motion was opposed by the State and denied by the court on September 30, 1976.

13. On November 3, 1976, prior to the start of his initial trial, petitioner orally renewed his third Motion to Dismiss in the Connecticut Superior Court. Said motion was opposed by the State and denied by the court on that date.

14. On November 16, 1976 after petitioner's initial trial had ended in a mistrial, petitioner made an oral motion for an immediate trial in the Connecticut Superior Court. Despite this motion, petitioner's second trial was delayed for almost two months, until January 11, 1977.

15. On January 11, 1977, prior to the start of his second trial, petitioner again

orally renewed his third Motion to Dismiss for want of a speedy trial in the Connecticut Superior Court. Said motion was opposed by the State and thereafter denied by the court.

16. Fourteen months and six days elapsed between the time petitioner first asserted his right to a speedy trial and the start of his initial trial.

17. Sixteen months and fourteen days elapsed between petitioner's initial assertion of his right to a speedy trial and the start of his second trial.

## III. REASONS FOR THE DELAY

18. Neither petitioner nor his counsel made any requests for continuances during the entire length of the delay between petitioner's arrest and subsequent trials.

19. No portion of the delay between petitioner's arrest and subsequent trials was caused by petitioner's actions in retaining the law firm of Friedman & Friedman as his counsel in place of Special Public Defender Joseph M. Brophy in July, 1976.

20. Petitioner made efforts to ensure that this change in counsel would not contribute to the delay in his case. Before Friedman & Friedman took over his defense, petitioner discussed his case thoroughly with Gerry Spiegel of that firm and he provided Attorney Spiegel with copies of all materials that he had concerning his case.

21. Petitioner paid Friedman & Friedman a retainer with money he inherited from his grandfather's estate and Friedman & Friedman undertook their representation of petitioner with a clear understanding that petitioner wanted an immediate and speedy trial. Petitioner's retained counsel promised petitioner that they would not delay his trial in any manner.

22. The State offered the following reasons to support its argument that the case against petitioner was factually complex: difficulty in obtaining corroborative evidence; problems with conflicting evidence; problems with inconsistent lab reports; problems with a large number of witnesses whose credibility was at issue; and uncertainty as to whether petitioner's accomplice,

Jean Siretz, would testify against petitioner.

23. All seventeen of the witnesses called by the State in the presentation of its case against petitioner were known and available to the State within days after petitioner was arrested and incarcerated on April 5, 1975.

24. Donald Stuart, a victim, was released from Norwalk Hospital one month after he was injured. He did not require further hospitalization nor was he ever placed under the care of a psychiatrist.

25. All statements of State's witnesses turned over by the State to the defense pursuant to then Section 2163 of the Connecticut Practice Book were in the possession of the State on or prior to April 8, 1975—three days after petitioner's arrest. Not one of the seventeen witnesses called by the State in the presentation of its case against petitioner gave any statements after April 8, 1975 which related to the subject matter of his testimony at petitioner's trial.

26. Twenty-six of the twenty-seven exhibits presented by the State at petitioner's trial were known and available to the State within a few weeks after petitioner was arrested and incarcerated on April 5, 1975.

27. Assistant State's Attorney Dominick Galluzzo, prosecutor of both petitioner's and Jean Siretz' case, made a tactical decision in the summer of 1975 to try Jean Siretz' case first because it was the stronger of the two.

28. The State, in its prosecution of petitioner, was presented with a number of legal questions concerning the interpretation of Connecticut General Statutes, sections 53a–8 through 53a–13, on aiding and abetting.

29. The legal issues contributed to the tactical decision by the State to proceed with the case against Jean Siretz before proceeding against petitioner.

30. There is no evidence that the State conducted lengthy plea negotiations with Jean Siretz or her counsel.

31. The sentence recommended by the State in Jean Siretz' case—7½ to 15 years—

and her receiving that sentence was not in any way related to her giving testimony at petitioner's trial.

32. Assistant State's Attorney Dominick Galluzzo did not talk to Jean Siretz until after she had pled guilty to reduced charges in September, 1976 and at the time he first talked with her, it was neither understood nor assumed that Jean Siretz would testify against petitioner in connection with his case.

33. The State was prepared to proceed to trial against petitioner regardless of whether or not Jean Siretz had testified.

34. The case against petitioner would not have been as strong had Jean Siretz not testified.

35. After Jean Siretz pled guilty to reduced charges in September, 1976 the State made a tactical decision to delay petitioner's trial to ensure that Jean Siretz would be sentenced by its outset. Said decision resulted in a delay of almost two months.

36. The State's rationale for delaying petitioner's trial until after Jean Siretz was sentenced was not to obtain the testimony of Jean Siretz, but rather to make her appear more credible in the eyes of the jury.

37. During the period of the delay in petitioner's case and Jean Siretz' case, the office of State's Attorney for Fairfield County followed a general practice of scheduling murder cases in chronological order. According to statements made by State's Attorney Donald Browne in open court before Superior Court Judge George Saden, the State implemented a policy whereby it drew up a list of murder cases pending in inverse order of time and it tried the oldest case first.

38. In preparing petitioner's case and in determining when to schedule his case, the State gave little or no consideration to the fact that petitioner had repeatedly asserted his right to a speedy trial. Whether or not a speedy trial motion was pending made no difference and was immaterial to the State's preparation and scheduling of cases.

39. Court backlogs and congested dockets contributed substantially to the delay in both petitioner's case and Jean Siretz' case.

40. Court backlogs and congested dockets had long existed in the courts of Fairfield County and in courts throughout the State of Connecticut prior to the pendency of petitioner's case.

41. Court backlogs and congested dockets became progressively worse during the decade immediately preceding petitioner's arrest and subsequent trials.

42. On July 1, 1966, the Superior Court of Connecticut began the fiscal year with 430 cases pending. By July 1, 1970 that figure had increased to 1,939 cases, of which 75% were awaiting disposition in Fairfield, Hartford and New Haven counties. By July 1, 1976 that figure had increased to 3,848 and by July 1, 1978 it had reached 3,862.

43. From July 1, 1966 to July 1, 1978 the number of cases pending in the Superior Court at the beginning of the fiscal year increased from 430 to 3,862, an increase of almost 800%.

44. During this period in which court backlogs and congested dockets were becoming progressively worse, the percentage of funds allocated to the State judicial system was steadily reduced.

45. During the 1964–1966 biennium, the State appropriated 3% of its general fund to the Judicial Department. By 1974–1975, the percentage of the general fund allocated to the Judicial Department had declined to 2.04% and by 1976–1977 it had declined even further to 1.8%. During 1977–1978 this percentage remained at 1.8%.

46. For a long period of time prior to petitioner's arrest and subsequent trials, State officials had been warned and were aware of the serious nature of the problems in the State courts. The State courts were cognizant of the need for additional personnel and expanded court facilities in order to keep up with the expected substantial increases in the number of civil and criminal cases filed in the 1970's.

47. The Connecticut State judicial system was inadequately staffed and seriously underfinanced at the time of petitioner's arrest and subsequent trials.

## IV. PREJUDICE TO THE DEFENDANT

48. Petitioner was incarcerated on April 5, 1975 and remained incarcerated continuously during the entire length of the delay between his arrest and subsequent trials because he was unable to raise enough money to post the bond set in his case.

49. On April 7, 1975 petitioner was placed in the Bridgeport Correctional Institution—the new jail on North Avenue—where he remained incarcerated continuously until March 18, 1977, the date he was sentenced in connection with these charges.

50. At the time of his arrest, petitioner was employed refurbishing yachts. The period of incarceration disrupted petitioner's employment as he was not again employed until he was transferred to the Connecticut Correctional Institution at Somers after he was sentenced.

51. Throughout the period of his pretrial incarceration at the North Avenue jail, petitioner was not provided a job or allowed to work because the bond set in his case was greater than $10,000.

52. During the time between petitioner's arrest and subsequent trials, he had no regular source of income other than gifts he received from his aunt and he was unable to meet all of his financial obligations.

53. Petitioner incurred and exhibited a great deal of anxiety throughout the period of his pretrial incarceration.

54. Dr. Joel Albert, psychiatrist at the Bridgeport jail prescribed various medications to relieve petitioner's anxiety. Prior to his incarceration, petitioner never had a prescription to ease anxiety.

55. Petitioner had very limited access to a telephone, and therefore was unable to contact witnesses on his own behalf. Rather, he had to rely almost totally on the efforts of his attorneys in contacting witnesses and preparing his defense.

56. The only telephone available to petitioner in the Bridgeport jail was the telephone located inside his counselor's office. In order to make a telephone call, petitioner had to file a written request identifying the person he wanted to call and what he wanted to say. Thereafter, if the request was granted, the counselor would usually make the call and then give petitioner a slip telling him what the person said in response to his message. Petitioner was generally not allowed to make any calls on his own.

57. Petitioner made numerous complaints to his attorneys and to prison officials about his limited access to a telephone.

58. State officials failed to turn over exculpatory statements of Jean Siretz to petitioner or his counsel despite the fact that on April 24, 1975 petitioner had filed a Motion for Discovery requesting in paragraph one, "Any and all exculpatory information or material in the possession, control and custody of the state."

59. Assistant State's Attorney Richard Jacobson filed a disclosure to petitioner's Motion for Discovery on June 11, 1975 which stated in paragraph one that, "The State's file contains no exculpatory information or material." At the time he made this statement, the State was in possession of conflicting statements made by Jean Siretz. Two of the three written statements and one oral statement of Jean Siretz in the possession of the State exculpated petitioner of any involvement in the crimes with which he was charged.

60. The State never turned over the statements of Jean Siretz and petitioner did not learn of the exculpatory information contained in said statements until sometime after Friedman & Friedman assumed his defense in July, 1976 when Warren Luedecker, petitioner's attorney, discovered this information through his own investigative efforts.

61. Peter Schaffer and Rick Seraphin were included on the list of witnesses that petitioner supplied to Special Public Defender Joseph Brophy in June, 1975.

62. Petitioner continually stressed the importance of Peter Schaffer and Rick Seraphin as witnesses on his behalf, and petitioner continually expressed his concern to

his attorneys about contacting them and having Schaffer and Seraphin available as witnesses at his trial.

63. Peter Schaffer and Rick Seraphin left the State of Connecticut during the delay between petitioner's arrest and subsequent trial and both were outside of the State at the time of petitioner's trials in November, 1976 and January, 1977.

64. Rick Seraphin joined the Navy and left the State of Connecticut in October, 1975. At the time of petitioner's trials in November, 1976, and January, 1977 Seraphin was stationed in Hawaii.

65. Peter Schaffer left the State of Connecticut on approximately September 15, 1975 and relocated in Denver, Colorado. Schaffer returned to Connecticut during the period from May, 1976 until August, 1976 and at the end of August, 1976 went back to Colorado. At the times of petitioner's trials in November, 1976 and January, 1977 Peter Schaffer was attending college in Leadville, Colorado.

66. If petitioner's trials had been held during the period of time that Peter Schaffer and Rick Seraphin were in the State of Connecticut, there is a substantial likelihood that they would have been contacted and that they would have appeared as witnesses on petitioner's behalf.

67. There is a subsequent likelihood that Peter Schaffer and Rick Seraphin could have provided important additional testimony in petitioner's defense including but not limited to testimony concerning the credibility of Jean Siretz, the State's principal witness.

68. Warren Luedecker, petitioner's counsel, attempted to contact Peter Schaffer and Rick Seraphin, but such efforts were unsuccessful.

69. Petitioner's counsel could have contacted Peter Schaffer through his parents, residents of Connecticut.

## DISCUSSION OF THE LAW

### I. EXHAUSTION OF STATE REMEDIES

Respondent asserts that petitioner has failed to exhaust his state remedies and has deliberately bypassed these remedies contrary to the dictates of 28 U.S.C. § 2254(b) and (c) (1976). While respondent admitted that state remedies had been exhausted in the Return to the Petition for a Writ of Habeas Corpus, we do not find that the statutory requirement of exhaustion in 28 U.S.C. § 2254 can be waived by the State. *United States ex rel. Sostre v. Festa,* 513 F.2d 1313, 1314, n. 1 (2d Cir.1975), *cert. denied,* 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975); *Davis v. Campbell,* 608 F.2d 317, 320 (8th Cir.1979). The exhaustion issue is based upon the grounds that petitioner has repeatedly referred to two evidentiary matters in proceedings before this court which have never been presented to a court of the state of Connecticut for consideration in reviewing petitioner's conviction. Specifically, respondent points to the failure of petitioner to raise upon appeal the potential testimony of two witnesses, Peter Schaffer and Rick Seraphin. Petitioner now alleges before this court that both persons were unavailable at trial as a direct result of his unduly lengthy pretrial incarceration. Respondent also argues that nowhere in his brief to the Connecticut Supreme Court did petitioner make reference to the State's failure to provide in a timely fashion exculpatory statements of the witness, Jean Siretz.

The United States Supreme Court in *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971), mandated that to have exhausted State remedies a petitioner must have "fairly presented" to the State court the same claim that is the basis for his petition for habeas corpus. The Second Circuit has framed the issue raised by evidentiary omissions as whether additional facts "materially alter" the petitioner's claim or "crucially affect" its determination such that petitioner must present this evidence to the State court before the federal court can entertain his petition. *Anderson v. Casscles,* 531 F.2d 682, 684 (2d Cir.1976). *See also Twitty v. Smith,* 614 F.2d 325, 327, n. 1, 331 (2d Cir.1979); *United States ex rel. Cleveland v. Casscles,* 479 F.2d 15, 20 (2d Cir.1973); *United States ex rel. Carbone v. Manson,* 447 F.Supp. 611, 618 (D.Conn.1978).

In the instant case, the substance of petitioner's argument is the constitutional claim that he was denied his sixth and fourteenth amendment right to a speedy trial. One component of that claim is that petitioner's ability to prepare and present his defense has been prejudiced by reason of the delay in bringing his case to trial. Both the general and narrow claims have been presented to the Connecticut Supreme Court. The nature of petitioner's claim has remained the same and thus cannot be viewed as materially altered. Further, although the additional evidence may strengthen petitioner's claim of prejudice to his ability to prepare his defense, it cannot be said to have critically affected the determination of the case as petitioner is not required to show prejudice in order to obtain relief. *Barker v. Wingo,* 407 U.S. 514, 533, 92 S.Ct. 2182, 2193, 33 L.Ed.2d 101 (1972). The United States District Court for the Northern District of Mississippi in a case comparable to the instant proceeding correctly observed:

> [T]he federal judiciary is often required in habeas proceedings to consider and act upon evidence which was unavailable or not presented to the state courts. See 28 U.S.C. § 2254(d); *Townsend v. Sain,* 372 U.S. 293 [83 S.Ct. 745, 9 L.Ed.2d 770] (1963) [citations omitted]. Thus, the availability of additional evidence, as contradistinguished from the raising of new constitutional issues, does not defeat an otherwise valid claim that state remedies have been exhausted. It is enough that the issue was identified with particularity and addressed by the State Supreme Court albeit upon a limited factual record.

*Ford v. Hollowell,* 385 F.Supp. 1392, 1397 (N.D.Miss.1974).

We conclude, therefore, that petitioner has exhausted his State remedies and that this court may entertain his substantive constitutional claim.

## II. THE SIXTH AMENDMENT CLAIM

The Sixth Amendment to the United States Constitution provides in part that: "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." The Supreme Court has declared this right "fundamental" and therefore incumbent upon the State by the operation of the fourteenth amendment. *Klopfer v. North Carolina,* 386 U.S. 213, 222–223, 87 S.Ct. 988, 993, 18 L.Ed.2d 1 (1967). The speedy trial clause was designed to prevent undue pretrial incarceration, minimize anxiety accompanying public accusation, and limit the possibility that long delay will impair the accused's ability to defend himself. *United States v. Ewell,* 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966). *See also Barker v. Wingo,* 407 U.S. at 530, 92 S.Ct. at 2192.

In 1972, the United States Supreme Court enunciated specific criteria by which to judge claims of deprivation of the right to a speedy trial. In the now landmark decision, *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Court adopted a case-by-case balancing test. Four elements—the length of the delay, the defendant's assertion of his right, the reasons for the delay, and the prejudice to the defendant caused by the delay—were identified by the Court as factors that should be assessed in each particular case. *Id.* at 530, 92 S.Ct. at 2192.

### 1. *The Length of the Delay*

The United States Supreme Court has ruled that the sixth amendment right to a speedy trial attaches at that point at which a person is arrested and held to answer on a criminal charge. *United States v. Marion,* 404 U.S. 307, 320–321, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971). *See also Dillingham v. United States,* 423 U.S. 64, 65, 96 S.Ct. 303, 304, 46 L.Ed.2d 205 (1975). Thus, in the present case, petitioner's right to a speedy trial attached on April 5, 1975 when he was arrested by the Norwalk, Connecticut police. From this date a period of eighteen months and twenty-eight days elapsed before petitioner was first brought to trial by the State on November 3, 1976. After the first trial ended in a mistrial on November 16, 1976, petitioner was not again brought to trial until January 11, 1977 or twenty-one months and six days after his constitutional right to a speedy trial was activated.

The Court in *Barker v. Wingo* noted that if the length of the delay in awaiting trial is presumptively prejudicial, it triggers an inquiry into the other elements considered in the balancing test. 407 U.S. at 530, 92 S.Ct. at 2192. An issue left unanswered by the Court is how long must a delay extend to become "presumptively prejudicial." The Court noted, "[n]othing we have said should be interpreted as disapproving a presumptive rule adopted by a court in the exercise of its supervisory powers which establishes a fixed time period within which cases must normally be brought." *Id.* at 530, n. 29, 92 S.Ct. at 2192 n. 29. The Second Circuit requires that the government must proceed to trial in its courts within six months of an arrest. Second Circuit Rules Regarding Prompt Disposition of Criminal Cases (1971). The Second Circuit in *United States v. New Buffalo Amusement Corp.*, 600 F.2d 368, 377 (2d Cir.1979), ruled that substantial delay places the burden upon the government to prove that the defendant's speedy trial rights were not abridged. The court cited *United States v. West*, 504 F.2d 253, 256–257 (D.C.Cir.1974), which had ruled that a one year delay results in prima facie evidence of a sixth amendment violation while a six month delay prompts an inquiry and a need for justification by the prosecution.

Clearly, the need for addressing the backlog in Connecticut state courts is a concern that strikes at the fundamental liberties secured for the people by the United States Constitution. The presumption of innocence of an accused quickly hollows where a speedy trial is denied. Few things are more tragic than an innocent defendant who is jailed for months on end, waiting for the government to proceed with prosecution. This court will not tolerate such unnecessary infractions of citizens' liberty where the sole justification amounts to little more than the State's inability to bring defendants to trial in an efficient and expeditious fashion. At this time, the court will proceed with a guarded confidence that the State will take appropriate curative action. Thus, we decline for the moment to adopt a rule or plan under which the State must bring a defendant to trial within a specific time frame. Rather, we note to the State our concern for this situation and choose to allow the State to adopt its own remedies rather than constricting its administrative and judicial process with artificial restraints. This view is predicated solely on the assumption that the State will make a good faith effort that will comport with the guarantees of the Speedy Trial Clause of the Sixth Amendment to the United States Constitution.

In the case at bar, there can be no question that defendant's nineteen month pretrial incarceration triggers an inquiry into the other guidelines enunciated in *Barker v. Wingo*. Further, we find that in view of the length of the delay the State must overcome the presumption of denial of petitioner's right to a speedy trial. The State has conceded this point.

2. *Petitioner's Assertion of His Right to a Speedy Trial*

The Court in *Barker v. Wingo* ruled that the force and frequency of a defendant's assertion of his right to a speedy trial was a factor to be given important consideration in the balancing process conducted by the courts. 407 U.S. at 528–529, 92 S.Ct. at 2191. According to the approach adopted by the Court, "The defendant's assertion of his speedy trial right ... is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Id.* at 531–532, 92 S.Ct. at 2193. In so ruling, the Court specifically rejected what it called the "demand waiver" doctrine, under which "a defendant waives any consideration of his right to speedy trial for any period prior to which he has not demanded a trial." *Id.* at 525, 92 S.Ct. at 2189.

In the present case, petitioner asserted his constitutional right to a speedy trial in a timely and vigorous fashion. Petitioner first asserted this right on August 28, 1975 —four months and twenty-three days after his arrest—and he reasserted this right on four additional occasions prior to his first trial on November 3, 1976. Finally, after his first trial ended in a mistrial on November 16, 1976, petitioner made an oral motion

to dismiss *prior to commencement of his* second trial on January 11, 1977.

The issue that must be resolved is not whether the petitioner asserted his right to a speedy trial—for he unquestionably did—but rather how heavily this should be weighed in favor of petitioner and against respondent. An important factor in this determination is that a large part of the delay between petitioner's arrest and trials occurred after petitioner first asserted his right to a speedy trial on August 28, 1975. Fourteen months and six days elapsed between the time petitioner first asserted his right to a speedy trial and the commencement of the first trial, while sixteen months and fourteen days elapsed between this initial assertion, and the start of his second trial.

The Second Circuit, in holding that a defendant's sixth amendment claim to a speedy trial had been violated found it "to be of especial importance that, even after [defendant] had clearly warned the government that he was not waiving his Sixth Amendment rights, there was an additional 14-month delay, a substantial portion of which was attributable to the government." *United States v. Carini,* 562 F.2d 144, 150 (2d Cir.1977). In the present case, not only was a "substantial portion" of the delay attributable to the respondent, but rather, all of the delay was so attributable. It is the court's opinion that once petitioner "had clearly raised the issue of his right to a speedy trial the government surely had fair warning that it would be held strictly accountable" for the passage of time *after* the speedy trial motion had been made. *Id.* at 150. Consequently, the petitioner's assertion of his right to a speedy trial and the prolonged pretrial period following petitioner's assertions weigh heavily against respondent.

### 3. *Reasons for the Delay*

The third factor in the *Barker v. Wingo* balancing process is the government's justification for the delay. The Court in *Barker* pointed out that delays can have diverse causes, some more legitimate than others. The Court concluded that different weights should be assigned to different reasons:

A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or over-crowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker v. Wingo,* 407 U.S. at 531, 92 S.Ct. at 2192 [footnote omitted].

At issue in the present case are three reasons offered by the State to justify the delay between arrest and trial. These include, A) complexity of petitioner's case; B) tactical decisions; and C) court backlogs and congested dockets. It is necessary to determine the legitimacy of these reasons and to ascertain the relative weight that should be accorded each.

This analysis, moreover, must be conducted in light of the fact that petitioner did not contribute in any way to the delay between arrest and trial. Testimony indicates that petitioner's change of counsel was not a factor in the delay of the case. Rather, petitioner retained counsel to replace the public defender upon the stipulation that the new counsel would not delay his case. Furthermore, the record indicates that petitioner never requested a continuance and at all times was ready to proceed to trial. Thus, resolution of the aforementioned issues respecting the reasons for the delay is made with the postulate that the entire length of the delay in petitioner's case is directly attributable to respondent, making it clear that respondent must sustain the burden of justifying the delay. At issue, therefore, is not whether the respondent is responsible for the delay; instead, the question is whether or not the State's reasons for the delay are justified.

### A. *Complexity of Petitioner's Case*

The first reason offered by the State for the nineteen month delay between arrest and trial is the complexity of petitioner's case. Respondent argues that the lack of

corroborative evidence, conflicting statements, inconsistent lab reports, a great number of witnesses whose credibility was at issue and the uncertainty of obtaining Siretz' testimony amount to a complex case, thus justifying the delay between arrest and trial. The evidence before the court does not support respondent's argument. We acknowledge that without the testimony of Jean Siretz the case becomes a difficult one to prosecute, but difficulty should not be confused with complexity.

The trial court record clearly shows that all of the witnesses and all but one of the exhibits utilized by the State in petitioner's trial were known or available to the State within a very short period of time after petitioner was arrested. A claim that witnesses were unavailable is unfounded. A victim of the crime was released from the hospital approximately one month after he was shot. The State's principal witness, Jean Siretz, was arrested on April 6, 1975, one day after the commission of the crime, and was in the custody of the State during the entire period of the delay. Further, the State eased its tactical situation with the conflicting statements by waiting seventeen months to turn them over to the defense. Moreover, the State did not proceed until two months before petitioner's trial to secure Ms. Siretz as a witness. Simply, they waited seventeen months before ever asking Jean Siretz for her testimony at petitioner's trial. Any argument that the delay was resulted from plea negotiations simply is not in accord with the facts.

The difficulties encountered in prosecuting petitioner's case do not reach the level of a valid reason such that they justify the lengthy delay of nineteen months. *Barker v. Wingo,* 407 U.S. at 531, 92 S.Ct. at 2192. In fact, it may be argued that the factors presented by respondent in support of its contention that this was a complex case, support instead, the importance of a speedy trial. It is clear that in a case such as this, where conflicting evidence exists, it is essential that the trial be held while memories are still fresh and before the erosive effects of the passage of time identified in

*Smith v. Hooey,* 393 U.S. 374, 380, 89 S.Ct. 575, 578, 21 L.Ed.2d 607 (1969), set in to retard the truth seeking process.

## B. *Delay Caused by Tactical Decisions*

Next the State contends that tactical considerations contributed to the delay of petitioner's trial. The Supreme Court in *Barker v. Wingo* stated that delay intended to hamper the defense or to gain tactical advantage over the defendant or to harass him, 407 U.S. at 531, n. 32, 92 S.Ct. at 2192 n. 32, should be weighted heavily against the government. *Id.* at 531, 92 S.Ct. at 2192.

The evidence indicates that a portion of the delay in petitioner's case can be attributed to a "tactical decision" by the Assistant State's Attorney. The State's Attorney, following Siretz' guilty plea in September 1976, made a tactical decision to delay petitioner's trial until Siretz had been sentenced. The reason for this delay was the State's belief that Siretz' testimony would be more credible once her case had been finally disposed. Therefore, petitioner's case was delayed an additional two months while Siretz awaited sentencing.

The delay caused by this tactical decision, though only a delay of two months, is clearly impermissible. This conduct fits clearly within the *Barker v. Wingo* language as an attempt to gain a tactical advantage over the petitioner, and accordingly weighs heavily against the respondent. 407 U.S. at 531, n. 32, 92 S.Ct. at 2192 n. 32; *United States v. Marion,* 404 U.S. at 325, 92 S.Ct. at 466. In addition, this two month delay to gain tactical advantage occurred at the period where defendant had been awaiting trial for seventeen months.

## C. *Court Backlogs and Congested Dockets*

The State now contends before this court that the complexity of the case in addition to court backlogs was primarily responsible for the delay in petitioner's trial. Curiously though, up until this juncture the State had attributed the delay exclusively to the congestion of the Connecticut criminal docket.[1]

---

1. Witness the State's position at the January 1976 hearing on petitioner's Motion to Dismiss:

MR. BROWNE: The only comment I can

Perhaps a re-reading of *Barker v. Wingo* may have alerted the State that the backlog justification was not a winning position. Whatever the motive behind the State's shift in position on the justification issue, their offerings simply do not exonerate them.

The Supreme Court in *Barker v. Wingo* characterized overcrowded courts as a "neutral reason" for delay in bringing a defendant to trial that should be weighted less heavily than a deliberate attempt to delay a trial. 407 U.S. at 531, 92 S.Ct. at 2192. At the same time, however, the Court indicated that despite this "neutral" characterization, overcrowded courts should nevertheless be considered, "since the ultimate responsibility for such circumstances must rest with the government rather than the defendant." *Id.*

Respondent argues that court backlogs and congested dockets in the judicial district of Fairfield, Connecticut, "played some part in slowing down the machinery necessary to expeditiously prosecute this case and all other cases." This argument grossly underestimates the serious nature and extent of the problem. Though we must weigh this reason less heavily against the respondent than a deliberate delay, we refuse to discount this factor as suggested by respondent.

The Second Circuit, likewise, on repeated occasions, has refused to treat court congestion as a valid justification for delay. In *United States v. Vispi,* 545 F.2d 328 (2d Cir.1976), the Court of Appeals ruled that a twenty month delay between the filing of the information and commencement of trial violated the defendant's sixth amendment rights. In analyzing the reasons offered in support of the delay, the court stated:

> We have repeatedly emphasized that affirmative action by the government in bringing cases to trial is mandated and that it cannot escape this duty on the ground that the delay is for institutional reasons. See *United States v. Bowman,* 493 F.2d 594 (2d Cir.1974); *United States v. Favolaro,* 493 F.2d 623, 625 (2d Cir. 1974); *United States v. Roberts,* 515 F.2d 642 (2d Cir.1975).

*Id.* at 334. *See also United States v. New Buffalo Amusement Corp.,* 600 F.2d at 377–378.

The alarming magnitude of court backlogs and congested dockets in the State of Connecticut is clearly presented in the evidence before the court. Petitioner's attorneys and the Assistant State's Attorney testified that court congestion is serious. In addition, various reports prepared by the State Judicial Department show a continued worsening of these conditions, and a concomitant failure by the State to take proper measures to remedy these conditions.

make is as Your Honor is aware this is a charge of murder, and, unfortunately, we still have a rather pressing backlog of cases that are murder cases. We have been able to resolve I think eight cases, eight murder cases since September.

I would just call Your Honor's attention that the murder in the McCarthy case, the alleged murder in this matter I believe occurred in April.

MR. BROPHY: Yes.

MR. BROWNE: Whereas other matters such as the Melendez matter Mr. Ganim was here on, that murder occurred, the alleged incident occurred in December of 1974, or four months before Mr. McCarthy's matters, and we are ready to proceed with the prosecution of a murder case before Judge Hull. But I think in fairness what we have done is at the direction of Judge Tierney in September he directed that a list of murder cases pending in inverse order of time, I guess would be the correct way, would be drawn up, and that the oldest case would be tried first. And we have resolved either seven or eight of those murder cases in that fashion. I think there are two or three cases before Mr. McCarthy's which in fairness to the accused should be tried first. That is the only comment I have. [See Transcript, Hearing on Motion to Dismiss, January 21, 1976, pp. 1–2].

And in its brief to the Connecticut Supreme Court, the State argued:

> The first consideration in analyzing the delay in the instant case would be the reason for the delay. The reason for the delay is quite apparently the crowded criminal docket in the Judicial District of Fairfield. That area like all other major judicial districts face [sic] a staggering quantity of criminal cases. With the judiciary and prosecutorial staffs working to their respective limits only a fixed quota can be achieved.

[Brief of Appellee, pages 8–9].

Fiscal decisions by the State play a major role in creating court congestion. This is not, however, a justifiable excuse for the prolonged delay in petitioner's case. It is a fundamental principal of constitutional law that constitutional obligations cannot be avoided because of a lack of funding. *See Detainees of Brooklyn House of Detention v. Malcolm,* 520 F.2d 392, 399 (2d Cir.1975); *Rhem v. Malcolm,* 507 F.2d 333, 341 (2d Cir.1974), *aff'd,* 527 F.2d 1041, 1043–1044 (2d Cir.1975); *Wyatt v. Aderholt,* 503 F.2d 1305, 1315 (5th Cir.1974); *Gates v. Collier,* 501 F.2d 1291, 1320 (5th Cir.1974); *Pugh v. Locke,* 406 F.Supp. 318, 330 (M.D.Ala.1976), *cert. denied, sub nom., Newman v. Alabama,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); *Hamilton v. Love,* 328 F.Supp. 1182, 1194 (E.D.Ark.1971). "Inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights." *Rhem v. Malcolm,* 507 F.2d at 341, n. 20.

It is clear from the evidence before the court that court backlogs and congested dockets were the *primary* reasons for a substantial portion of the delay in petitioner's case. Prevailing case law requires that these institutional delays are properly charged against the respondent. *See Barker v. Wingo,* 407 U.S. at 531, 92 S.Ct. at 2192; *United States v. New Buffalo Amusement Corp.,* 600 F.2d at 377–378; *United States v. Lane,* 561 F.2d 1075, 1078 (2d Cir.1977); *United States v. Vispi,* 545 F.2d at 334.

The remaining issue concerning court congestion is how heavily should this reason be weighted against the respondent. A two month delay, or even a six month delay caused by crowded dockets may well be tolerated in these times of increasing crime. After a point, as the length of delay increases, its weight begins to aggregate. Thus, a four month delay caused by court backlogs and congested dockets would weigh less heavily against the government than a nineteen month delay. This approach is in harmony with the flexible policy adopted in *Barker v. Wingo,* yet it recognizes that court congestion is not of petitioner's making. In view of the serious nature and extent of court congestion in the State of Connecticut and the State's awareness of these conditions, and in view of the fact that court congestion was the primary reason for the nineteen month delay in petitioner's case, this reason weighs heavily against the respondent. The foregoing reasons offered by the State do not meet its obligation to justify the delay. As such, the reason for delay is weighted against the State.

In conclusion, the reasons offered to justify the delay of nineteen months between arrest and trial weigh strongly in favor of petitioner and against respondent. The Supreme Court directs that different weights should be assigned to different reasons. *Barker v. Wingo,* 407 U.S. at 531, 92 S.Ct. at 2192. We examined three reasons: A) complexity of petitioner's case; B) tactical decisions; and C) court backlogs and congested dockets, and scrutinized each in finding that the reasons for delay were unjustified. This conclusion is supported by the fact that petitioner in no way contributed to the delay and at an early date asserted his right to a speedy trial.

### 4. Prejudice to the Defendant

Before considering the amount of prejudice suffered by petitioner, it is important to note that the United States Supreme Court has clearly established that an affirmative demonstration of prejudice is not necessary in order to prevail on a speedy trial claim. *Moore v. Arizona,* 414 U.S. 25, 26, 94 S.Ct. 188, 189, 38 L.Ed.2d 183 (1973); *Barker v. Wingo,* 407 U.S. at 533, 92 S.Ct. at 2193. In *Moore,* the Court, quoting *Barker* stated:

We regard none of the four factors identified above [length of delay, reason for delay, defendant's assertion of his right, and prejudice to the defendant] as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing

process. But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution.

414 U.S. at 26, 94 S.Ct. at 189.

This position was succinctly summarized by the Fifth Circuit in *Hoskins v. Wainwright,* 485 F.2d 1186, 1192 (5th Cir.1973). In that decision, the court upheld a defendant's sixth amendment claim and it stated, "there must be some point of coalescence of the other three factors in a movant's favor, at which prejudice—either actual or presumed—becomes totally irrelevant." *Id.* *See also United States v. Avalos,* 541 F.2d 1100, 1116 (5th Cir.1976); *Turner v. Estelle,* 515 F.2d 853, 858 (5th Cir.1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976); *Prince v. State of Alabama,* 507 F.2d 693, 706–707 (5th Cir.1975), *cert. denied,* 423 U.S. 876, 96 S.Ct. 147, 46 L.Ed.2d 108 (1975), *rehearing denied,* 423 U.S. 940, 96 S.Ct. 301, 46 L.Ed.2d 273 (1975).

Such a point of "coalescence" has been reached in the present case. The delay was substantial, petitioner asserted his right to a speedy trial in a timely and vigorous fashion and the State cannot offer a valid justification for the delay. In view of the large amount of weight accorded these three factors on the facts of this particular case, it seems clear that an affirmative demonstration of prejudice is not necessary. The question is, however, a close one and if a showing of prejudice is needed to tip the scales in favor of petitioner, such a demonstration of injury must only be minimal.

Despite the fact that the element of prejudice need not even be considered, the evidence before the court plainly shows that petitioner did in fact incur substantial prejudice as a result of the delay. The Supreme Court in *Barker v. Wingo* identified three interests of the defendant that must be considered when assessing prejudice. These include: A) prevention of oppressive pretrial incarceration; B) minimizing anxiety and concern of the accused; and C) limiting the possibility that the defense will be impaired. 407 U.S. at 532, 92 S.Ct. at 2192. While it is true that the Supreme Court recognized the last interest as the "most serious," *id.,* the Court has made clear that all three of these interests must be taken into consideration in analyzing the factor of prejudice, and has expressly stated that "prejudice to a defendant caused by delay in bringing him to trial is not confined to the possible prejudice to his defense in those proceedings." *Moore v. Arizona,* 414 U.S. at 26–27, 94 S.Ct. at 190 [footnote omitted]. According to the Court, prejudice caused by delay in bringing a defendant to trial includes possible prejudice which inordinate delay may have in seriously interfering with his liberty, whether he is free on bail or not; disrupting his employment; draining his resources; curtailing his associations; subjecting him to public obloquy; and creating anxiety in him, his family and his friends. *Id.* at 27, 94 S.Ct. at 190. *See also United States v. Marion,* 404 U.S. at 320, 92 S.Ct. at 463.

### A. Prevention of Oppressive Pretrial Incarceration

The Supreme Court in *Barker v. Wingo* noted that time spent in jail awaiting trial has a detrimental impact on the individual. 407 U.S. at 532–533, 92 S.Ct. at 2193. This is borne out by the evidence before this court. Petitioner testified that during his pretrial incarceration he was without a job and without a source of income. His personal associations were limited. Recreational facilities were limited and very few programs or activities were available to petitioner. Racial tensions were present and attacks by other inmates were not uncommon. The lighting, noise level and temperature made the jail particularly uncomfortable and the jail itself was overcrowded. The evidence shows that petitioner was incarcerated during the entire length of the delay between arrest and trial—eighteen months and twenty-eight days between his arrest and first trial, and twenty-one months and six days between his arrest and the commencement of his second trial.

Petitioner argues that the combination of the period of incarceration coupled with the

conditions present at the jail amount to substantial prejudice. Certainly this is true when viewed in light of the length of the delay and the lack of justification for it, while petitioner vigorously yet vainly asserted his right to a speedy trial. Though this factor weighs less heavily against the State than the factor of impairment to the defense, it nevertheless reaches the threshold level necessary to establish prejudice based on the facts of the case at bar.

### B. *Anxiety and Concern of the Accused*

The evidence shows that petitioner incurred and exhibited a great deal of anxiety and concern during his pretrial incarceration. This was testified to both by petitioner and his counsel and is augmented by the fact that petitioner was prescribed medication by the jail psychiatrist because of his mental state.

Despite, or perhaps because of, the universality of this type of prejudice, the Supreme Court seems to weigh this factor less heavily than harm to the preparation of one's defense. In *Barker,* the accused lived under a cloud of suspicion and anxiety for a period of over four years. 407 U.S. at 534, 92 S.Ct. at 2194. Moreover, earlier in the same term the Court declared this one of the "major evils protected against by the speedy trial guarantee...." *United States v. Marion,* 404 U.S. at 320, 92 S.Ct. at 463. Nonetheless, the Court concluded that the prejudice to the defendant was minimal. *Barker v. Wingo,* 407 U.S. at 534, 92 S.Ct. at 2194.

The present case, however, is factually distinguishable from *Barker* with respect to this issue. First Barker was released on bond during much of the four year period referred to by the Court. In addition, the Court placed great significance on the fact that Barker did not want a speedy trial. In the present case, the petitioner was incarcerated during the entire pretrial period and furthermore, continually asserted a demand for a speedy trial.

As a result, we believe prejudice to petitioner as a result of anxiety and concern, while not substantial, is more than minimal. It cannot, therefore, be ignored.

### C. *Impairment of Defense*

The most important interest of the defendant to consider when assessing prejudice is the impairment that the defense suffered as a result of the delay between the arrest and trial. The Supreme Court in *Barker v. Wingo* labeled impairment of defense as the most serious form of prejudice, "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious." 407 U.S. at 532, 92 S.Ct. at 2193.

Petitioner supports his claim that his defense was impaired by the delay between arrest and trial with proof that two potential defense witnesses left the State of Connecticut during the delay and both were outside the State at the time of petitioner's trials in November 1976 and January 1977. The evidence shows that both witnesses could have provided material evidence to petitioner's defense. Petitioner's counsel testified before this court that he would have called one of the witnesses, and that he probably would have called the other had he been able to contact them.

Respondent argues that the value of the proffered testimony of these two witnesses is open to question in that the witnesses would have been offered only to impeach the testimony of the State's principal witness, Siretz. The State argues that the areas of impeachment were already fully explored at trial. These areas included Siretz' possible motivations for her testimony and the discrepancies in her use of petitioner's name in her statements to the police. Furthermore, respondent argues that these two witnesses were hardly material and that there is no reasonable likelihood that their testimony would have changed the outcome of petitioner's trial. The court disagrees with respondent's conclusions. The testimony of these two witnesses could have provided important material evidence for the defense, evidence that may well have exonerated petitioner.

Specifically, these two witnesses could have offered testimony concerning the credibility of Jean Siretz, the State's principal

witness—a witness described by respondent as crucial to the State's case against the petitioner and without whom there would have been a paucity of evidence on the essential issue on trial. Siretz gave three separate written statements to the Norwalk, Connecticut police, each of which gave a completely different version of what happened on the morning of April 5, 1975, the date of the shootings. The first statement denied that she or petitioner had any involvement in the shootings; in the second statement Siretz admitted to the shootings, but denied that petitioner had any involvement; and in the third statement, Siretz admitted to the shootings but claimed she did so only because of the urging and the direction of petitioner. In addition, Siretz, at approximately the time she gave her second statement, made a telephone call to her mother in which she told her mother that she shot the victims but that "he" wasn't with her and "he" didn't know what she did until she told "him."

In view of these contradictory statements, and in view of the fact that Siretz pled guilty to the reduced charges of manslaughter and assault, an important theme or theory of petitioner's defense centered around attempting to establish that Siretz' third statement and her testimony at trial were fabricated most probably to gain favorable treatment from the State.

One witness, Peter Schaffer, has testified before this court that Jean Siretz told him that she might be in jail for only a short time or that she could conceivably be released on probation. He indicated that he was surprised at this remark. His testimony certainly would have bolstered the defense contention that Ms. Siretz had made a deal with the prosecutor to testify against petitioner in exchange for leniency in her own case. Due to Peter Schaffer's absence, petitioner was deprived of his testimony at trial.

The defense strategy centered upon calling into question the truthfulness and authenticity of the third statement given by Siretz to the police. In that statement, Siretz curiously referred to petitioner as "Robert" twenty-two times, and never once referred to him as "Bob." This, despite the fact that in her first statement she referred to petitioner as "Bob" seventeen times and never once as "Robert," and likewise in her second statement, Siretz referred to petitioner sixteen times as "Bob" and not once did she refer to him as "Robert." Thus, in view of the peculiar way in which Siretz addressed the petitioner in the one incriminating statement she gave to police, it is clear that independent testimony on this point would have lent much credence to the defense theme.

The two defense witnesses who left the State of Connecticut during the delay and who were outside the State at the time of petitioner's trials could have offered testimony that they had a longstanding relationship with petitioner and Siretz and that during this entire period of time, Siretz never referred to petitioner as "Robert." The record of petitioner's trials shows that petitioner's attorney did not present any independent witnesses to testify to this fact. It is clear, therefore, that this area was not fully explored at petitioner's trial.

Finally, respondent argues that petitioner made only a "half-hearted" effort to secure the presence of these two witnesses. The evidence shows that petitioner at all times stressed the importance of these witnesses, having communicated this concern to his attorney both in writing and orally. Petitioner's attorney testified that he made a concerted effort to secure the presence of one of the witnesses and that he made some efforts to contact the other witness. Evidence shows that while one witness was continually outside of Connecticut during the delay in question, the other witness was in and out of the State of Connecticut during the time and could have been contacted through his parents who reside in Connecticut.

The fact that a more diligent effort by petitioner's attorney may have resulted in locating at least one of these witnesses is mitigated by two factors. First, petitioner himself was not in a position to supplement the efforts of his attorney in locating these witnesses. Petitioner, as a result of his incarceration, had only limited access to a

telephone. The fact that extended pretrial incarceration impairs a defendant's ability to defend himself was expressly recognized by the Supreme Court in *Barker v. Wingo.* The Court stated, "if a defendant is locked up, he is hindered in his ability to gather evidence, *contact witnesses,* or otherwise prepare his defense." 407 U.S. at 533, 92 S.Ct. at 2193 [emphasis added]. Petitioner's incarceration directly hindered his ability to contact these witnesses, a situation unquestionably prejudicial.

The second factor mitigating the argument that more diligence on the part of petitioner's attorney would have produced these witnesses is that actions by State officials contributed to the absence of these witnesses. On April 24, 1975 petitioner, by his counsel, filed a Motion for Discovery requesting, "any and all exculpatory information or material in possession, control and custody of the State." On June 11, 1975 the State filed a disclosure stating that, "the State's file contains no exculpatory information or materials." Neither petitioner nor his counsel learned of Siretz' first two statements, or her telephone conversation to her mother, all of which exculpated petitioner, until well into the Fall of 1976 when petitioner's attorney discovered the information through his own investigative efforts.

Thus, it is clear that the failure of the State to produce this exculpatory material prevented petitioner and his counsel from realizing the extreme importance of these two witnesses, and from taking precautions which might have made their testimony available at trial. In addition, the evidence shows that the State was apparently aware of this exculpatory material when it filed its disclosure in response to petitioner's discovery motion.

Obviously, petitioner's defense was impaired by the delay between his arrest and trial resulting in prejudice to his case. Equally as obvious is the conclusion that this inability of petitioner to adequately prepare his case "skews the fairness of the entire system." *Barker v. Wingo,* 407 U.S. at 532, 92 S.Ct. at 2193.

Summarizing the prejudice to petitioner as a result of the delay in bringing the case to trial, petitioner was prejudiced by both oppressive pretrial incarceration and anxiety and concern. While these two interests are not to be weighed heavily against the State, they are in light of the facts of this case, sufficient to give rise to the requisite amount of prejudice that tips the scale clearly against the State. Moreover, when these factors are coupled with the impairment to petitioner's defense, no doubt can remain as to the severe nature of the infringement of petitioner's constitutional guarantee to a speedy trial.

We believe that because the delay was substantial, because petitioner asserted his right to a speedy trial in a timely and vigorous manner, and because respondent cannot validly justify the delay, a significant showing of prejudice is not necessary. In the alternative, however, it is our opinion that the evidence before the court clearly shows that petitioner did in fact incur substantial prejudice as a result of the prolonged nineteen-month delay.

## CONCLUSION

The Sixth Amendment to the United States Constitution provides in part that, "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." The factors to be evaluated in determining whether a defendant has been denied his right to a speedy trial are clearly delineated by the Supreme Court in *Barker v. Wingo.* These factors are: 1) the length of the delay; 2) the reasons for the delay; 3) whether the defendant asserted his right to a speedy trial; and 4) the prejudice resulting to the defendant from the delay.

The evidence in the present case shows: 1) that the delay between petitioner's arrest and trial was substantial; 2) that the reasons for the delay are not of a type which can justify the delay; 3) that petitioner asserted his right to a speedy trial in a timely and vigorous fashion; and 4) that petitioner did in fact incur substantial prejudice as a result of the delay.

For these reasons, this court concludes that petitioner has made a satisfactory showing in accordance with the principles advanced by the Supreme Court in *Barker v. Wingo,* and that he was denied his right to a speedy trial.

Accordingly, it is ordered that petitioner's Writ of Habeas Corpus is granted. It is further ordered that the judgments of conviction be reversed and petitioner be discharged from custody.

Dated at Hartford, Connecticut, this 28th day of October, 1981.